IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: 5:22-cv-2163 |
| | ) |
| REPUBLIC STEEL, | ) |
| | ) |
| Defendant. | ) |

**CONSENT DECREE**

TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................... 2
II.     JURISDICTION AND VENUE ............................................................................... 3
III.    APPLICABILITY ...................................................................................................... 3
IV.     DEFINITIONS............................................................................................................ 4
V.      CIVIL PENALTY....................................................................................................... 7
VI.     COMPLIANCE REQUIREMENTS...................................................................... 8
VII.    REVIEW AND APPROVAL OF DELIVERABLES ....................................... 20
VIII.   REPORTING REQUIREMENTS ........................................................................ 22
IX.     STIPULATED PENALTIES ................................................................................. 24
X.      FORCE MAJEURE .................................................................................................. 29
XI.     DISPUTE RESOLUTION ...................................................................................... 31
XII.    INFORMATION COLLECTION AND RETENTION .................................... 33
XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS......................... 35
XIV.    COSTS ........................................................................................................................ 37
XV.     NOTICES.................................................................................................................... 37
XVI.    EFFECTIVE DATE.................................................................................................. 38
XVII.   RETENTION OF JURISDICTION....................................................................... 38
XVIII.  MODIFICATION ...................................................................................................... 38
XIX.    TERMINATION........................................................................................................ 39
XX.     PUBLIC PARTICIPATION ................................................................................... 40
XXI.    SIGNATORIES/SERVICE..................................................................................... 41
XXII.   INTEGRATION ........................................................................................................ 41
XXIII.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION............................. 41
XXIV.  HEADINGS ................................................................................................................ 41
XXV.    FINAL JUDGMENT ............................................................................................... 41
XXVI.  APPENDICES ........................................................................................................... 42

# I.    BACKGROUND

A.    Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint in this action concurrently with this Consent Decree, alleging that Defendant, Republic Steel, violated Section 113(b) of the Clean Air Act (the "CAA" or the "Act"), 42 U.S.C. § 7413(b).

B.    The United States contends that Defendant has violated certain CAA requirements at its steel production facility in Canton, Ohio (the "Facility").  More specifically, the Complaint alleges that Defendant violated three requirements under a Permit to Install issued by the Ohio Environmental Protection Agency ("Ohio EPA") pursuant to federally-enforceable provisions of the Ohio State Implementation Plan: (1) failure to comply with lead emission limits for the Facility's Flexcast Vacuum Tank Degasser ("VTD") when it performed lead degassing; (2) failure to conduct a performance test for lead emissions from the Flexcast VTD; and (3) failure to conduct parametric monitoring and recordkeeping at various times.

C.    The injunctive relief in this Consent Decree, specifically the emission controls pertaining to the Flexcast VTD and Cooling Tower Control System, are to reduce lead emission from the Defendant's Facility and to reduce the potential for any excess lead emissions.

D.    Defendant does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

E.    The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section II, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and over the Parties.  Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the Defendant resides in this judicial district.  For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

2.    For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## III.    APPLICABILITY

3.    The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.    No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented.  At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written

agreement, to EPA and DOJ, in accordance with Section XV (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.     DEFINITIONS

7.     Terms used in this Consent decree that are defined in the Act or in regulations promulgated pursuant to the Act have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"Clean Air Act," "CAA," or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and is implementing regulations.

"Complaint" means the complaint filed by the United States in this action.

"Consent Decree" or "Decree" means this Decree and Appendix A attached hereto (listed in Section XXVI).

"Cooling Tower Control System Parameter Values" means the values for the Cooling Tower Emissions Control System Parameters that either EPA has approved pursuant to

Paragraph 19 or proposed by Defendant in its Compliance Demonstration Report prior to EPA approval.

"Date of Entry of this Consent Decree" or "Date of Entry" means the Effective Date of this Consent Decree as set forth in Section XVI.

"Date of Lodging of this Consent Decree" or "Date of Lodging" means the date that this Consent Decree is filed for lodging with this Court, pending solicitation of public comment.

"Day" means a calendar day unless expressly stated to be a business day. In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

"Defendant" means Republic Steel.

"DOJ" means the United States Department of Justice and any of its successor departments or agencies.

"Effective Date" means the definition provided in Section XVI.

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

"Facility" means Defendant's steel plant located at 2633 8th St NE, Canton, Stark County, Ohio.

"Flexcast Building" and "Flexcast" means the building at the Facility that houses, among other equipment, a VTD where lead can be added to the molten steel before casting. The Flexcast Building is physically connected and partially open to the Meltshop Building.

"HEPA Filter" means a high efficiency particulate air filter that can theoretically remove at least 99.97% of airborne particles with a size of 0.3 microns.

"Inertial Separator" or "Cyclone" means a device that uses centrifugal force to separate and control solid or liquid particulate matter.

"Lead Degassing" means the process by which a ladle with leaded steel is returned to the VTD for purposes of removing lead from the steel.

"Lead NAAQS" means the primary and secondary National Ambient Air Quality Standards for lead, measured as lead in total suspended particulates, not to exceed 0.15 micrograms per cubic meter over a 3-month rolling average.

"Meltshop Building" and "Meltshop" mean Defendant's building housing two electric arc furnaces and supporting equipment at Defendant's Facility. The Meltshop Building is physically connected and partially open to the Flexcast Building.

"Ohio EPA" means the Ohio Environmental Protection Agency and any of its successor departments or agencies.

"Ohio SIP" means the Ohio State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

"Paragraph" means a portion of this Decree identified by an Arabic numeral.

"Parties" means the United States and Defendant.

"Permit to Install" or "Flexcast Permit" means Defendant's 2004 Permit to Install No. 15-01578, issued by Ohio EPA.

"Section" means a portion of this Decree identified by a Roman numeral.

"State" means the State of Ohio.

"Title I" means Title I of the Clean Air Act.

"Title V Permit" means an operating permit issued under Title V of the Clean Air Act.

"United States" means the United States of America, acting on behalf of EPA.

"VTD" means vacuum tank degasser.

## V.    CIVIL PENALTY

8.    Within 90 Days after the Effective Date, Defendant shall pay the sum of $990,000 as a civil penalty, together with interest accruing from the Date of Lodging, through the date of payment, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging.

9.    Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the DOJ account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Northern District of Ohio after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions for Defendant to:

> Robert Koury
> Republic Steel
> 2633 8th Street N.E.
> Canton, Ohio 44704
> rkoury@republicsteel.com

Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section XV (Notices).

10.    At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ via email or regular mail in accordance with Section XV; and (iii) to EPA in accordance with Section XV. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent

Decree in *United States v. Republic Steel* and shall reference the civil action number, CDCS

Number and DOJ case number 90-5-2-1-12589.

11.     Defendant shall not deduct any penalties paid under this Decree pursuant to this

Section or Section IX (Stipulated Penalties) in calculating its federal income tax.

## VI.     COMPLIANCE REQUIREMENTS

A.     INSTALLATION AND DEMONSTRATION OF FLEXCAST VTD
       DEMISTER AND HEPA FILTER

12.     <u>Upgrades to Flexcast VTD Emissions Control System</u>.  Defendant shall install and

operate the Inertial Separator and HEPA Filter pollution control equipment at the Flexcast VTD.

      a.     Within 60 Days of the Effective Date, Defendant shall submit to EPA for

review and approval the Flexcast VTD Control Plan that describes the

pollution control system at the Flexcast VTD – including the Inertial

Separator and the HEPA Filter – and obtain EPA's approval of the overall

control efficiency of the pollution control equipment prior to installation.

      b.     Within 180 Days after the Effective Date or EPA's approval of the design

overall control efficiency, which ever date is later, Defendant shall install and

commence operation of the Inertial Separator and HEPA Filter at the Flexcast

VTD at the Facility to aid in the control of lead emissions from the Flexcast

VTD.  The system shall be consistent with the Flexcast VTD Control Plan

described in Paragraph 12.a.  The "Flexcast VTD Emissions Control System"

shall thereafter consist of the steam ejector/condenser system, the Inertial

Separator and the HEPA filter, and Defendant shall thereafter operate the

Flexcast VTD Emissions Control System at all times when the Flexcast VTD

is in operation. Defendant shall construct the Flexcast VTD Emissions Control

System such that volumetric flow rates and pollutant emission rates can be accurately determined by applicable test methods and procedures at the outlet stack. Defendant may submit a request for extension of the deadline for installation of the Inertial Separator and HEPA Filter at the Flexcast VTD based upon delays in the delivery of necessary equipment due to third party supply constraints, which shall be subject to EPA's review and approval under Consent Decree Section VII (Review and Approval of Deliverables).

13. <u>Compliance Demonstration Protocol</u>. Within 30 Days after EPA's approval of the Flexcast VTD Control Plan pursuant to Paragraph 12.a, Defendant and EPA shall meet to discuss a proper methodology for testing the lead emission rate from the VTD stack. By no later than 30 Days after installation and commencement of operation of the Inertial Separator and HEPA Filter at the Flexcast VTD, Defendant shall submit to EPA for review and approval pursuant to Section VII (Review and Approval of Deliverables) a Compliance Demonstration Protocol for the Flexcast VTD Emissions Control System. The Compliance Demonstration Protocol shall describe the methodology by which the Flexcast VTD Emissions Control System will be tested to determine the lead emission rate from the VTD stack. The Compliance Demonstration Protocol shall require the compliance demonstration to be carried out under process operating conditions producing the highest possible lead emissions to the Flexcast VTD Emissions Control System, and shall include the following operating scenarios:

a. Testing of a leaded-steel heat to produce leaded steel with the highest lead content/inoculation in the preceding 12 months; and

b. Unless Defendant can develop an alternative to degas at the Flexcast VTD that is approved by EPA under Consent Decree Section VII (Review and

9

Approval of Deliverables) prior to the date of testing, testing of Lead

Degassing to remove the lead from molten steel. EPA's decision on degas

alternatives shall not be subject to Consent Decree Section XI (Dispute

Resolution).

14. <u>Commencement and Completion of Compliance Demonstration.</u> By no later than 30 Days after receipt of EPA's approval of Defendant's Compliance Demonstration Protocol for the Flexcast VTD Emissions Control System, Defendant shall demonstrate the effectiveness of its Flexcast VTD Emissions Control System to control lead emissions from the Flexcast VTD and demonstrate compliance with applicable Flexcast Permit lead emission limits by conducting the testing in accordance with the EPA-approved Compliance Demonstration Protocol. EPA may extend the deadline in Paragraph 14 for the demonstration of the effectiveness of the Flexcast VTD Emissions Control System upon written request from Defendant.

15. <u>Compliance Demonstration Report.</u> By no later than 30 Days after completion of the Compliance Demonstration, Defendant shall submit to EPA for review and approval pursuant to Section VII (Review and Approval of Deliverables) a Compliance Demonstration Report.

a.     The Compliance Demonstration Report shall describe the conditions under which the Compliance Demonstration was carried out, all results of performance testing, and all steps taken to comply with the Compliance Demonstration Protocol.

b.     In the Compliance Demonstration Report, Defendant shall submit to EPA for review and approval pursuant to Section VII (Review and Approval of Deliverables) operating parameters, which shall include at a minimum the pressure drop across the HEPA filter, for the Inertial Separator and HEPA

10

filter and the proposed operating parameter values that it proposes to use in operating the Flexcast VTD Emissions Control System (the "Flexcast VTD Emissions Control System Parameters").

      c.     For the purposes of this Consent Decree, the "Flexcast VTD Control System Parameter Values" are the values for the Flexcast VTD Emissions Control System Parameters that either EPA has approved pursuant to Paragraph 15.b or proposed by Defendant in its Compliance Demonstration Report prior to EPA approval. These values shall be used by Defendant to demonstrate continuous compliance with applicable Flexcast Permit emission limits for lead at the Flexcast VTD.

**B.    REPLACEMENT AND DEMONSTRATION OF COOLING TOWER DEMISTERS AND EXHAUST FAN MOTORS**

16.    <u>Cooling Tower Improvements</u>. Defendant shall replace the demisters at the cooling tower at the Flexcast VTD with new demisters that are designed to achieve cooling tower drift loss of 0.001% or less. Reducing drift loss will decrease the amount of lead particles emitted by the cooling tower to the atmosphere. The Cooling Tower Emission Control System Parameter Values shall be used by Defendant to demonstrate continuous compliance with applicable Title I and Title V Permit emission limits for lead at the cooling tower.

      a.     Attached hereto as Appendix A are design specifications for the cooling tower demisters for Model XF80Max that Defendant will use as replacement demisters.

      b.     Defendant shall (1) install replacement cooling tower demisters no later than September 30, 2022 and (2) replace the cooling tower exhaust fan motors with a variable frequency drive motor and install associated flow meters and a

controller ("Cooling Tower Emissions Control System") within thirty (30) Days of delivery of the equipment for replacement of the cooling tower exhaust fan motors. The Cooling Tower Emissions Control System shall be consistent with the design plan attached to this Consent Decree as Appendix A. Once installed, Defendant shall operate the Cooling Tower Emissions Control System at all times when the cooling tower is in operation.

17. <u>Compliance Demonstration Protocol</u>. By no later than 30 Days after installation and commencement of operation of the Cooling Tower Emissions Control System, Defendant shall submit to EPA for review and approval pursuant to Section VII (Review and Approval of Deliverables) a Compliance Demonstration Protocol for the Cooling Tower Emissions Control System. The Compliance Demonstration Protocol shall describe the methodology by which the Cooling Tower Emissions Control System will be tested to determine the drift loss and lead emissions from the cooling tower. The Compliance Demonstration Protocol shall require the compliance demonstration to be carried out under process operating conditions producing the highest possible total liquid drift and highest lead concentration in the water measured at the inlet of the cooling tower, as well as meeting the requirements of relevant EPA test methods, and shall include the following operating scenarios:.

a. Testing of a leaded-steel heat to produce leaded steel with the highest lead content/inoculation in the preceding 12 months; and

b. Unless Defendant can develop an alternative to degas at the Flexcast VTD that is approved by EPA under Consent Decree Section VII (Review and Approval of Deliverables) prior to the date of testing, testing of Lead Degassing to

remove the lead from molten steel.  EPA's decision on degas alternatives shall not be subject to Consent Decree Section XI (Dispute Resolution).

18.    <u>Commencement and Completion of Compliance Demonstration.</u>  By no later than 30 Days after receipt of EPA's approval of Defendant's Compliance Demonstration Protocol for the Cooling Tower Emissions Control System, Defendant shall demonstrate the effectiveness of the Cooling Tower Emissions Control System at minimizing drift loss by maximizing efficient operation of the Cooling Tower Emission Control System in order to achieve a drift loss of not more than 0.001%, thereby controlling lead emissions, by conducting the testing of drift loss in accordance with the EPA-approved Compliance Demonstration Protocol.

19.    <u>Compliance Demonstration Report.</u>  By no later than 30 Days after completion of the compliance demonstration, Defendant shall submit to EPA for review and approval pursuant to Section VII (Review and Approval of Deliverables) a Compliance Demonstration Report.  The Compliance Demonstration Report shall describe the conditions under which the compliance demonstration was carried out, all results of performance testing, and all steps taken to comply with the Compliance Demonstration Protocol.  If the Compliance Demonstration Report shows that the Cooling Tower Emission Control System did not achieve a drift loss of 0.001% or less, Defendant shall include in its Compliance Demonstration Report modifications and a schedule for implementing any modifications to the Cooling Tower Emission Control System necessary to achieve a drift loss of not more than 0.001%.  The Compliance Demonstration Report shall include proposed values for the following operating parameters (the "Cooling Tower Emissions Control System Parameters") with which it proposes to use in operating the modified cooling tower:

a.    Maximum lead mass rate in the cooling water entering the cooling

tower; and

        b.      Operating parameters for cooling tower.

C.      OPERATION OF EMISSIONS CONTROL SYSTEM

20.      Within 30 Days of the Effective Date, Defendant shall modify its "Leaded Steel Parametric Monitoring and Recordkeeping Plan" to require, for each lead inoculation event, monitoring and recording of:

        a.      the tank/suction pressure prior to energizing the suction fume step (atmospheric pressure);

        b.      the tank/suction line pressure after the suction fume step has been initiated and stabilized; and

        c.      the after-condenser water temperature after the suction fume step has been initiated and stabilized.

The Defendant shall not commence with lead inoculation unless the suction fume step pressure is less than the atmospheric pressure.

21.      After Defendant's submission of the Flexcast VTD and Cooling Tower Compliance Demonstration Reports, Defendant shall operate the Flexcast VTD Emissions Control System and Cooling Tower Emissions Control System at all times the Flexcast VTD and cooling tower are operating in a manner not to exceed, or go below, whichever is applicable, the Control System Parameter Values for each emissions unit. Once the Values are established, such Values shall become enforceable limits under this Consent Decree and Defendant shall submit a Title I permit application to incorporate the limits into Defendant's applicable permit.

22.      After Defendant's submission of the Compliance Demonstration Reports, Defendant may not alter operation of the Flexcast VTD, cooling tower, or their respective

Emissions Pollution Control Systems in any way that could affect emissions of lead unless Defendant first performs an additional compliance demonstration under the altered operation conditions in accordance with Paragraphs 17 through 19 and thereby demonstrates that, after implementing the proposed alteration, the operation of the Flexcast VTD and cooling tower in accordance with the Flexcast VTD Control System Parameter Values and Cooling Tower Control System Parameter Values would continue to satisfy the lead emission limits of each applicable permit. This provision does not require approval of production fluctuations that may occur where such fluctuations do not result in exceedance of the lead emission limits.

D.     COMPLIANCE MANAGEMENT SYSTEM

23.     Within ninety (90) Days from the Effective Date, Defendant shall install and operate continuous electronic differential pressure and negative pressure monitors and recorders for the Flexcast baghouse.  The system shall automatically notify operators whenever the differential pressure or negative pressure is out of range for the Flexcast baghouse. Defendant may submit a request to extend the deadline to install the electronic differential pressure and negative pressure monitors and recorders for the Flexcast baghouse, which shall be subject to EPA's review and approval under Consent Decree Section VII (Review and Approval of Deliverables).

24.     Within ninety (90) Days from EPA's approval of the Flexcast VTD Control System Parameter Values, Defendant shall install an automatic electronic monitoring and recording system for the Flexcast VTD that is capable of automatically recording on a frequent basis all Flexcast VTD Emissions Control System Parameters.  The system shall automatically notify operators whenever the Flexcast VTD Emissions Control System Parameters are out of range.  Defendant may submit a demonstration that automatic electronic monitoring is either cost

prohibitive or not feasible based upon the configuration of the Flexcast and may submit an alternative method for monitoring the Flexcast VTD Emissions Control System Parameters, which shall be subject to EPA's review and approval under Consent Decree Section VII (Review and Approval of Deliverables).

25.     Within ninety (90) Days from EPA's approval of the Cooling Tower Emission Control System Parameter Values, Defendant shall install an automatic electronic monitoring and recording system for the Cooling Tower that is capable of automatically recording on a frequent basis all Cooling Tower Control System Parameter Values.  The system shall automatically notify operators whenever the Cooling Tower Control System Parameter Values are out of range.  Within ninety (90) days after submission of the Compliance Demonstration Report, Defendant shall commence measuring once per day for a period of not less than 180 days the lead concentration and flow rate of the cooling water entering the Cooling Tower and use these measurements to calculate and record the mass rate of lead in the cooling water on a monthly average basis.  Defendant may request a new frequency of no less than two lead concentration and flow measurements per week, to occur on the same days of the week and at the same times of the day each week,  following 180 days of daily lead concentration and flow rate measurements.  Any request to modify measurement frequency shall be subject to EPA approval under Consent Decree Section VII (Review and Approval of Deliverables).  Defendant may submit a demonstration that automatic electronic monitoring is either cost prohibitive or not feasible based upon the configuration of the cooling towers and may submit an alternative method for monitoring the Cooling Tower Emission Control System Parameters Values, which shall be subject to EPA's review and approval under Consent Decree Section VII (Review and Approval of Deliverables).

26.     Within ninety (90) Days from  EPA's approval of the Cooling Tower Emission Control System Parameters and EPA's approval of the Flexcast VTD Control System Parameter Values (whichever approval date is later), Defendant shall develop and implement a comprehensive Compliance Management System ("CMS") that identifies each monitoring, recordkeeping and reporting obligation related to pollution control equipment under the Permit to Install at or related to the Flexcast VTD and addresses the parameters automatically monitored in Paragraphs 23-25 above.  The CMS shall also include the following:

   a.   Internal procedures for notifying when parameters are out of range so that they can be immediately investigated, corrected, and actions documented;

   b.   A schedule for, and recording of, when equipment maintenance is performed and when instruments used to measure operating parameters are calibrated; and

   c.   The central location where all records – both hard copies and digital, required by the Facility's recordkeeping obligations – are kept, so they can be referenced when completing reporting obligations.

27.     Defendant shall report within the semi-annual progress report required by Paragraph 41 all deviations of parametric limits identified in the CMS that occurred during the relevant six-month reporting period, including:

   a.   The length of the deviation from the parametric limit;

   b.   The cause of the deviation;

   c.   The step(s) taken to bring the equipment back into compliant parameters; and

   d.   The step(s) taken to prevent further deviation of the parametric limit.

28.     <u>Good Air Pollution Control Practices.</u>  At all times including during startup,

shutdown, or the malfunction of equipment related to the Flexcast VTD, Defendant shall operate

the Flexcast VTD, the Flexcast VTD Emissions Control System, and the Cooling Tower Control

System in a manner consistent with safety and good air pollution control practices to minimize

lead emissions to the greatest extent possible, to minimize periods of upset or malfunction, and

to ensure their continued proper performance, or, as needed, replacement.  At the time of its

submission of the Compliance Demonstration Reports pursuant to Paragraphs 15 and 19,

Defendant shall submit to EPA a copy of its written startup, shutdown, and malfunction plan.

     E.      PERMITTING AND EMISSION CREDIT PROVISIONS

     29.     <u>Permits Including Control System Parameter Values</u>.  By no later than 60 Days

after EPA approves the Compliance Demonstration Reports and Control System Parameter

Values under Paragraphs 15 and 19, Defendant shall submit to Ohio EPA a request for a permit

modification under Ohio Admin. Code 3745-31 for the installation and continuous operation of

the Flexcast VTD Emissions Control System and Cooling Tower Emissions Control System.

The request shall include a copy of the Compliance Demonstration Reports as an attachment or

appendix.  The requested permit requirements will survive termination of this Consent Decree

and will require adherence to the Control System Parameter Values enumerated in the EPA-

approved Compliance Demonstration Reports for purposes of demonstrating compliance with

applicable permit emission limits.  The request shall include a requirement to take immediate

corrective actions should a parameter exceedance occur, as well as the required monitoring

frequencies and recordkeeping requirements for each Parameter Value.  The Control System

Parameter Values may be adjusted in subsequent permitting as confirmed by testing.

     30.     <u>Additional Permit Conditions.</u>  The Title I permit application shall include the

following:

a. A requirement to conduct, every five years, drift measurement testing to determine the drift factor for the cooling tower using the test protocol approved pursuant to Paragraph 17;

b. A requirement to monitor and record all parametric values according to Paragraphs 24 and 25; and

c. A requirement to comply with Defendant's Standard Operating Procedure ("SOP") for eliminating Lead Degassing events.

31. <u>Application for a Revised Title V Permit</u>. After Defendant's application under Paragraph 29 is approved, within 90 Days, Defendant shall apply to amend the applicable Title V Permit for the Facility under Ohio Admin. Code 3745-77 to include: a requirement to adhere to the Flexcast VTD Control System Parameter Values and Cooling Tower Control System Parameter Values, monitoring frequencies, and SOP provisions, etc., contained in the permit issued under Paragraph 29; and a copy of the Compliance Demonstration Reports for the Flexcast VTD and Cooling Tower Emissions Control Systems as an attachment or appendix.

32. <u>Prohibition on Use of Emission Reductions</u>. Defendant shall neither generate nor use any emission reductions resulting from the installation and operation of the Emissions Control Systems required by this Consent Decree as creditable, contemporaneous emissions decreases or emission offset credits in any Prevention of Significant Deterioration ("PSD"), major New Source Review ("NSR"), and/or minor NSR permit or permit proceeding, or under the Ohio New Source Review program (OAC 3745-31-10), or in any emission reduction trading market system. In addition, the emissions reductions of that result from implementing the terms of this Consent Decree may not be sold or traded by Defendant. However, nothing in this Paragraph shall be construed to limit Defendant's generation and use of emission reductions that

are achieved from sources not under the Consent Decree, or reductions of any other pollutant at any source. Furthermore, nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by EPA or the State as creditable contemporaneous decreases for the purpose of mitigation under this Consent Decree, attainment demonstrations submitted pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, or air quality related values.

33. <u>Timely and Complete Applications and Delays in Permits or Approvals</u>. Where any compliance obligation under this Section requires Defendant to obtain any other federal, state, or local permit or approval, or modification to any existing federal, state or local permit or approval, Defendant shall submit timely and complete applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section X of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and taken all other actions within Defendant's control necessary to obtain all such permits or approvals.

## VII. REVIEW AND APPROVAL OF DELIVERABLES

34. <u>Approval of Deliverables</u>. After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA will in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

35. If the submission is approved pursuant to Paragraph 34(a), Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and

requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 34(b) or (c), Defendant shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section XI (Dispute Resolution).

36.     If the submission is disapproved in whole or in part pursuant to Paragraph 34(c) or (d), Defendant shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

37.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, or EPA may correct any deficiencies subject to Defendant's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

38.     If Defendant elects to invoke Dispute Resolution, as set forth in Section XI (Dispute Resolution), Defendant shall do so by sending a Notice of Dispute in accordance with Paragraph 69 within 30 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

39.     Any stipulated penalties applicable to the original submission, as provided in Section IX, accrue during the 45 Day period or other specified period, but shall not be payable

unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## VIII.   REPORTING REQUIREMENTS

40.      At least 14 days prior to startup of the Continuous Bloom Casting Facility ("CBCF"), Defendant shall submit notification to EPA of its intent to resume production of leaded steel and/or non-leaded steel at the CBCF.  Defendant has a permit for the CBCF, although it is not currently operating the CBCF.

41.      Defendant shall submit a semi-annual progress report by July 31st (for the reporting period from January 1 to June 30) and January 31st (for the reporting period from July 1 to December 31) of each year after the Lodging of this Consent Decree, until termination of this Decree pursuant to Section XIX.  Defendant shall submit the reports to EPA at the addresses set forth Section XV (Notices).  Each semi-annual report shall contain the following information:

      a.   Each report shall describe the work performed and progress made toward implementing the requirements of Section VI (Compliance Requirements), including a narrative description of activities undertaken, problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; operation and maintenance; reports to state agencies; the status of any construction or compliance measures, and the completion of any milestones.

42.      If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify DOJ and EPA of such violation and its likely

duration, in writing, within ten business days of the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section X (Force Majeure).

43.     Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA orally or electronically as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

44.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

45.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

46.     The reporting requirements of this Consent Decree do not relieve Defendant of

any reporting obligations required by the Act or implementing regulations, or by any other

federal, State, or local law, regulation, permit, or other requirement.

47.     Any information provided pursuant to this Consent Decree may be used by the

United States in any proceeding to enforce the provisions of this Consent Decree and as

otherwise permitted by law.  All information submitted by Republic Steel to the United States

shall be subject to public inspection unless identified and supported as confidential business

information ("CBI").  As to any information Republic Steel seeks to protect as CBI pursuant to

40 C.F.R. Part 2, Republic Steel shall follow the procedures set forth in 40 C.F.R. Part 2.  Under

no circumstances shall emissions data be identified or considered CBI.

## IX.    STIPULATED PENALTIES

48.     Defendant shall be liable for stipulated penalties to the United States for

violations of this Consent Decree as specified below, unless excused under Section X (Force

Majeure). A violation includes failing to perform any obligation required by the terms of this

Decree, including any work plan or schedule approved under this Decree, according to all

applicable requirements of this Decree and within the specified time schedules established by or

approved under this Decree.

49.     Late Payment of Civil Penalty.  If Defendant fails to pay the civil penalty required

to be paid under Section V (Civil Penalty) when due, Defendant shall pay a stipulated penalty of

0.25% of the unpaid principal amount per Day for each Day that the payment is late.

50.     Submittal and Approval of the Design Overall Control Efficiency and Compliance

Demonstration Reports. Subject to Section VI (Compliance Requirements), for failure to timely

submit a) design and overall control efficiency for the VTD Emission Control System as

required by Subparagraph 12.a.; b) design and specification plans for the Cooling Tower

Demisters as required by Subparagraph 16.a; c) Compliance Demonstration Protocols as

required by Paragraphs 13 and 17; Compliance Demonstration Reports as required by

Paragraphs 15 and 19 of the Consent Decree, stipulated Penalties shall accrue as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th Day |
| $1,250 | 15th through 30th Day |
| $2,500 | 31st Day and beyond |

51.     Emissions Limits/Parameter Values. For failure to meet the emission requirement

in Paragraph 21 of this Consent Decree, simultaneous exceedances of multiple related parameter

values only counts as a single exceedance for purposes of counting as an exceedance, and

stipulated penalties shall accrue as follows:

| Penalty Per Violation Per Day | Number of Exceedances |
|---|---|
| $1,250/Day | 1-5 Exceedances/Day |
| $2,500/Day | 6-10 Exceedances/Day |
| $4,500/Day | 11+ Exceedances/Day |

52.     Compliance Requirements.  For failure to implement the following compliance

requirements (except those submittal of compliance protocols and demonstration reports which

are set out separately in Paragraph 50 and reporting requirements which are set out separately in

Paragraph 53) in accordance with the requirements of the Decree, including a) demonstration of

the effectiveness of its Flexcast VTD Emissions Control System in accordance with Paragraph

14; b) replacement of the cooling tower demisters and exhaust fan motor in accordance with

Paragraph 16.b; c) cooling tower improvements that will maximize the efficient operation of the

Cooling Tower Emission Control System and achieve a drift loss of not more than 0.001% in accordance with Paragraph 18; d) routine preventative maintenance of the Flexcast VTD Emissions Control System and Cooling Tower Emissions Control System in accordance with Paragraph 22; e) installation and operation of the compliance management system, in accordance with Paragraphs 23 (monitors and recorders for the Flexcast baghouse), 24 (automatic electronic monitoring and recording system for the Flexcast VTD), 25 (automatic electronic and recording system for the Cooling Tower), and 26 (develop and implement a comprehensive Compliance Management System), stipulated penalties shall accrue per violation per Day for each violation:

| Penalty Per Violation Per day | Period of Noncompliance |
| --- | --- |
| $1,250 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

53.     Reporting Requirements. For failure to meet the reporting requirements of Section VIII (Reporting Requirements), stipulated penalties shall accrue as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $400 | 1st through 14th Day |
| $750 | 15th through 30th Day |
| $1,500 | 31st Day and beyond |

54.     Stipulated penalties under this Consent Decree shall begin to accrue the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

55. Defendant shall pay any stipulated penalty within 45 Days of receiving the United States' written demand unless the demand is disputed in accordance with the requirements in Section XI (Dispute Resolution) of this Consent Decree.

56. The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

57. Stipulated penalties shall continue to accrue as provided in Paragraph 54, during any Dispute Resolution, but need not be paid until the following:

    a. If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

    b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

    c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

58. Obligations Prior to the Effective Date. Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations of Paragraph 16.b. that have occurred prior to the Effective Date, provided that

stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

59.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 9 and with the confirmation notices required by Paragraph 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

60.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

61.     The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

62.     Non-Exclusivity of Remedy.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.     FORCE MAJEURE

63.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

64.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice by email to the EPA contacts identified in Section XV (Notices) of this Consent Decree, within 72 hour of when Defendant first knew that the event might cause a delay. Within seven Days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting

any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

65. If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

66. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

67. If Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 63 and 64. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.    DISPUTE RESOLUTION

68.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

69.    Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends DOJ and EPA a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

70.    Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by sending DOJ and EPA a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

71.    The United States will send Defendant its Statement of Position within 45 Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position

31

and any supporting documentation relied upon by the United States. The United States'
Statement of Position is binding on Defendant, unless Defendant files a motion for judicial
review of the dispute in accordance with the following Paragraph. Where appropriate, the
United States may allow submission of supplemental statements of position by the parties in
dispute.

72. Judicial Dispute Resolution. Defendant may seek judicial review of the dispute
by filing with the Court and serving on the United States a motion requesting judicial resolution
of the dispute. The motion (a) must be filed within ten Days of receipt of the United States'
Statement of Position pursuant to the preceding Paragraph; (b) may not raise any issue not raised
in informal dispute resolution pursuant to Paragraph 69, unless the Plaintiffs raise a new issue of
law or fact in the Statement of Position; (c) shall contain a written statement of Defendant's
position on the matter in dispute, including any supporting factual data, analysis, opinion, or
documentation, and (d) shall set forth the relief requested and any schedule within which the
dispute must be resolved for orderly implementation of the Consent Decree.

73. The United States shall respond to Defendant's motion within the time period
allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent
permitted by the Local Rules.

74. Standard of Review

    a. Disputes Concerning Matters Accorded Record Review. Except as otherwise
provided in this Consent Decree, in any dispute brought under Paragraph 70
pertaining to the adequacy or appropriateness of plans, procedures to
implement plans, schedules or any other items requiring approval by EPA
under this Consent Decree; the adequacy of the performance of work

undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 70, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

75. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 57. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII. INFORMATION COLLECTION AND RETENTION

76. The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs and similar data; and

e. assess Defendant's compliance with this Consent Decree.

77. Upon request, Defendant shall provide EPA or its authorized representative splits of any samples taken by Defendant. Upon request, EPA shall provide Defendant splits of any samples taken by EPA.

78. Until four years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

79. At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege

recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

80.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

81.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or State laws, regulations, or permits.

## XIII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

82.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the Date of Lodging.

83.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly

specified in Paragraph 82. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

84. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 82.

85. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, or with any other provisions of federal, State, or local laws, regulations, or permits.

86. This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the

rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

87.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIV.   COSTS

88.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XV.    NOTICES

89.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email), addressed as follows:

As to the United States Department of Justice:

> By email:
> eescdcopy.enrd@usdoj.gov
> Re: DJ # 90-5-2-1-12589

As to EPA:
> R5aecab@epa.gov
> mcauliffe.mary@epa.gov

As to Republic Steel:

> Republic Steel
> 2633 8th St. NE
> Canton, OH 44704
> Attn:  Associate General Counsel
> Email:  mwalker@republicsteel.com

90.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

91.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   EFFECTIVE DATE

92.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVII.           RETENTION OF JURISDICTION

93.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVIII. MODIFICATION

94.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

95.     Any disputes concerning modification of this Decree shall be resolved pursuant to

Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof

provided by Paragraph 74, the Party seeking the modification bears the burden of demonstrating

that it is entitled to the requested modification in accordance with Federal Rule of Civil

Procedure 60(b).

## XIX.   TERMINATION

96.     Defendant shall operate the Flexcast VTD Emissions Control System and Cooling

Tower Emissions Control System for a period of two years, and maintain continuous satisfactory

compliance with the Flexcast VTD Control System Parameter Values and Cooling Tower

Control System Parameter Values for a period of at least two years before seeking to terminate

this Consent Decree.  Defendant shall obtain Title I and Title V permit modifications consistent

with Paragraph 29 through 31 before seeking to terminate this Consent Decree.

97.     After Defendant has completed the requirements of Section VI (Compliance

Requirements), has thereafter maintained continuous satisfactory compliance with this Consent

Decree and Defendant's permit for a period of two years, has complied with all other

requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated

penalties as required by this Consent Decree, Defendant may serve upon the United States a

Request for Termination, stating that Defendant has satisfied those requirements, together with

all necessary supporting documentation.

98.     Following receipt by the United States of Defendant's Request for Termination,

the Parties shall confer informally concerning the Request and any disagreement that the Parties

may have as to whether Defendant has satisfactorily complied with the requirements for

termination of this Consent Decree.  If the United States agrees that the Decree may be

terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

99.     If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section XI (Dispute Resolution).  However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 45 Days after service of its Request for Termination.

## XX.     PUBLIC PARTICIPATION

100.     This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XXI.     SIGNATORIES/SERVICE

101.     Each undersigned representative of Defendant and the undersigned representative of the Environment and Natural Resources Division of the Department of Justice identified on the DOJ signature page below, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

102.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to

all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXII.     INTEGRATION

103.     This Consent Decree, including deliverables that are subsequently approved pursuant to this Decree, constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements and understandings, whether oral or written, concerning the subject matter of the subject matter of the Decree herein.

## XXIII.     26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

104.     For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and performance of Section III (Applicability) Paragraphs 3-6; Section VI (Compliance Requirements); Section VIII (Reporting Requirements); Section XII (Information Collection and Retention) Paragraphs 76-79; and Appendix A is restitution, remediation, or required to come into compliance with law.

## XXIV.     HEADINGS

105.     Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXV.     FINAL JUDGMENT

106.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.  The

Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58.

**XXVI.     APPENDICES**

107.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the Design Plan and Parameters for the Cooling Tower Emission Control System

Dated and entered this _____ day of _____, 2022

_____
UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

12/1/2022
Date

s/Samantha M. Ricci
SAMANTHA M. RICCI
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-3856
Email: samantha.ricci@usdoj.gov

MICHELLE M. BAEPPLER
First Assistant United States Attorney

JACKSON FROLIKLONG
Assistant United States Attorney
208 Federal Building
Two South Main Street
Akron, Ohio 44308-1855
Phone: (216) 622-818
Email: jfroliklong@usdoj.gov

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY

ROBERT
KAPLAN

Digitally signed by
ROBERT KAPLAN
Date: 2022.10.18
12:21:50 -05'00'

_____
Date

ROBERT A. KAPLAN
Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Boulevard
Chicago, IL 60604

McAuliffe,
Mary

Digitally signed by
McAuliffe, Mary
Date: 2022.10.18
09:04:19 -05'00'

MARY T. McAULIFFE
Associate Regional Counsel
U.S. Environmental Protection Agency
Region V (C-14J)
77 West Jackson Blvd.
Chicago, IL  60604-3590

FOR REPUBLIC STEEL

10/05/2022
Date

JAIME VIGIL
President & CEO
2633 8th St. NE
Canton, OH 44704