```
 1                   UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3

     UNITED STATES OF AMERICA,
 4
                   Plaintiff,           Case No. 5:22CV2163
 5                                       Akron, Ohio
             vs.                         Thursday, May 4, 2023
 6                                       10:30 a.m.
     REPUBLIC STEEL,
 7
                   Defendant.
 8

 9                 TRANSCRIPT OF FAIRNESS HEARING
               BEFORE THE HONORABLE JOHN R. ADAMS
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:    Samantha M. Ricci
                           U.S. Department of Justice - M Street
13                         150 M Street, NW, Suite 5.1402
                           Washington, DC 20002
14                         (202) 532-3850

15                         Joseph J. Froliklong
                           Office of the U.S. Attorney - Cleveland
16                         Carl B. Stokes U.S. Courthouse
                           801 Superior Avenue, West, Suite 400
17                         Cleveland, Ohio 44113
                           (216) 622-3818
18
     For the Defendant:    John W. Lewis
19                         Zachary J. Adams
                           Nelson, Mullins, Riley & Scarborough
20                         1111 Superior Avenue, Suite 530
                           Cleveland, Ohio 44114
21                         (216) 304-6181

22   Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
                           Federal Building & U.S. Courthouse
23                         2 South Main Street, Suite 568
                           Akron, Ohio 44308
24                         (330) 252-6021

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
```

1                    <u>Thursday, May 4, 2023</u>

2              THE COURT:  For the record, the Court has before

3       it today Case Number 5:22CV2163.  The case is United States

4       of America versus Republic Steel.

5              We're here today regarding a proposed consent decree.

6              Counsel for the government, are you ready to proceed,

7       and please identify yourself for the record?

8              MS. RICCI:  Yes, Your Honor.  Samantha Ricci for

9       the United States.

10             THE COURT:  Thank you.

11             On behalf of Republic Steel.

12             MR. LEWIS:  Good morning, Your Honor.  John Lewis

13      for Republic Steel along with my colleague, Zach Adams.

14             THE COURT:  Thank you.

15             I've read the complaint, the brief in support of the

16      consent decree, along with the various comments, the

17      exhibits which set forth comments from interested parties.

18             Counsel for the government, I'm not sure who wishes to

19      go first and provide me information in support of why it is

20      you believe I should approve the decree.  You're certainly

21      free to do that.  And I have many questions and many issues,

22      to be candid.

23             MS. RICCI:  Yes, Your Honor.  Samantha Ricci

24      again for the United States.  I am prepared to go first and

25      have prepared a two-part presentation for the Court, if you

1    would like me to begin with that.

2              THE COURT:  You may.

3              MS. RICCI:  Okay.  Thank you.

4         May I approach the podium?

5              THE COURT:  Sure.  You may move around the

6    courtroom.  We don't have a jury, so some of the formalities

7    we can forgo.

8              MS. RICCI:  Your Honor, before I begin, we have a

9    PowerPoint presentation.  Is that okay with you if we run

10   that right now?

11             THE COURT:  Yes.

12             MS. RICCI:  Thank you.

13        The United States' presentation to the Court today is

14   going to consist of two parts to best explain the case

15   history, the proposed settlement, the compliance

16   requirements, the public comments, and the United States'

17   response to the public comments.

18        First, for Part I, you will hear from me.  I was the

19   lead negotiator on the case for the United States.  I will

20   be able to provide the Court with, again, a brief summary of

21   the proposed settlement, how it satisfies the standards for

22   entry, and address the public comments and the United

23   States' responses.

24        Then for Part II I have with me an EPA engineer, Mr.

25   Dakota Prentice, which I will put on direct testimony from

1    him so he can provide the Court with a timeline of the case

2    as he was the lead EPA engineer on the case.  So he can

3    describe what happened from the initial inspection through

4    the settlement negotiations.

5           He can also then explain to the Court the compliance

6    requirements that are in place in the consent decree along

7    with explaining to the Court how those compliance measures

8    are adequate.  And EPA is going to be able to assure that

9    through various EPA review and approval that is implemented

10   through the consent decree with each step of implementation.

11          And finally, Mr. Prentice will also be able to explain

12   to the Court the safeguards that are in place in the consent

13   decree to routinely ensure compliance after implementation.

14          Now, Your Honor, because of the serious nature of lead

15   emissions, from the beginning of the case the United States

16   diligently focussed on ensuring that adequate pollution

17   controls are installed at Republic Steel's facility to

18   prevent further excess lead emissions in the community.

19          For example, and as we mentioned in our papers, there

20   is a current state action addressing facility-wide

21   violations under the Clean Air Act at the Republic Steel

22   facility.

23          Shortly after the state initiated that case against

24   Republic Steel, EPA decided that it needed to conduct its

25   own inspection at the Republic Steel facility.

1          During that inspection, EPA identified what is called

2      the Flexcast Vacuum Tank Degasser or commonly referred to as

3      the Flexcast VTD.

4          EPA identified that unit as the most significant

5      source of lead emissions at the Republic Steel facility.

6      Therefore, we then structured our enforcement efforts and

7      the negotiations on that one source.

8          And then the United States then carved that portion

9      from the state's case and took that on as the United States'

10     enforcement action.

11         As a result, we were able to address the most

12     significant source of the problem in the most efficient way

13     possible.

14         And Your Honor, that's demonstrated by the fact that

15     the parties had an agreement in principle on the consent

16     decree terms and penalty within about one year after EPA's

17     inspection of the facility.

18             THE COURT:  I'm sorry to interrupt, but I assume

19     you're going to get to the emissions, how long these

20     emissions have been ongoing, the extent of the emissions,

21     how much they exceeded the permit, things of that nature.

22             MS. RICCI:  Your Honor, during the direct

23     testimony of Mr. Prentice, he will explain a lot more about

24     those types of questions you have.  If you don't mind, can I

25     get -- or would you like me to --

1          THE COURT:  I don't mind, but it's going to be

2     very important to let us know how long these emissions have

3     been occurring as best you know.

4          MS. RICCI:  I mean, I can tell you that the

5     emissions -- the facility has not had the requisite controls

6     in place, and so ever since --

7          THE COURT:  For how long?

8          MS. RICCI:  Since they've operated since I

9     believe 2004 is the year that I'm aware of.

10          THE COURT:  So since 2004 there have been

11     emissions exceeding the permit?

12          MS. RICCI:  Well, the emissions -- they exceed

13     their permit limit when they have what's called the

14     degassing event which, again, Your Honor, my EPA engineer is

15     much more skilled at technically describing this.

16          THE COURT:  So how long has this process been

17     utilized?

18       I read your papers.  And I'm sorry.  I'm getting right

19     to the point on some of these matters.  They're important.

20     I hope you know this.

21          MS. RICCI:  Absolutely.

22          THE COURT:  So how long have the emissions been

23     ongoing?  You describe the process that generates the

24     addition of the lead to the melting process, if that's the

25     right term, which then creates the emissions, these lead

1    emissions.

2          So how long have they been going on?

3          MS. RICCI:  Your Honor, the best way I can

4    explain it to you is that it's not that it's an ongoing

5    thing.  It's that when a certain event happens in the

6    process, that's not a planned event, it's more of, you know,

7    an incident that will happen occasionally during operations,

8    that is when these excess emissions occur.

9          THE COURT:  So how long has Republic Steel been

10   using this process which requires them to add the lead,

11   which then creates the emissions which creates this

12   environmental concern?

13         I mean, that should be something that you should know.

14   I apologize.  Let me rephrase it.  That's something that I

15   certainly, the Court, should know, and hopefully the EPA

16   would know because it would have a great bearing on a whole

17   number of things in this case.

18         So how long has Republic been using this process?

19         I can look at your papers, and there is some ambiguity

20   as to how long.

21         Do you know how long they've been using the process?

22         MS. RICCI:  It's my understanding that since

23   they've been operating the Flexcast VTD that these degassing

24   events occur and then these excess emissions occur.

25         So since they've been in operation.  That is my

1   understanding.

2            THE COURT:  So how often are they using this

3   process?

4            MS. RICCI:  I --

5            THE COURT:  Daily?  Weekly?  Monthly?  Yearly?

6   Do we know, or am I getting ahead of myself?

7            MS. RICCI:  Again, Your Honor, I think when I do

8   the direct testimony of Mr. Prentice, he can go through

9   discussion about these events and how EPA identified these

10  events.

11           THE COURT:  You identified them in 2020, as

12  you're telling me now and your papers say.

13           MS. RICCI:  Right.

14           THE COURT:  And you learned of them through some

15  other ongoing matter with the Ohio EPA; is that correct?

16           MS. RICCI:  We learned that there was -- we found

17  out about -- when Ohio filed their complaint, their action

18  against Republic Steel, that's when EPA did the inspection,

19  yes.

20           THE COURT:  Okay.  So is the inspection -- at the

21  time of the inspection, you then learned about this process

22  and these emissions?

23           MS. RICCI:  Yes.  Mr. Prentice witnessed this

24  process and then -- so through the inspection, and then

25  subsequent information requests, responses to those.

1           THE COURT:  So how long was Republic Steel using

2    this process, this process through Flexcast VTD, which

3    includes the addition of certain alloys, as I read your

4    complaint, paragraph 32, steel is taken to the VTD where

5    additional alloys are added including lead.

6           And it's the lead, adding the lead wire to the steel

7    which as I understand it is what's triggered these lead

8    emissions, reading your complaint, paragraph 32, 33.

9           So my question is, how long has this process been used

10   or utilized by Republic Steel?  Do we know?

11          MS. RICCI:  In terms of how the process, how long

12   degassing events have been occurring, I know that with our

13   alleged violations in the complaint and the records that EPA

14   received, they were able to identify the number of degassing

15   events that occurred.  We could identify 22 for sure and 33

16   that we are almost certain occurred.

17          THE COURT:  22 events or 33?

18          MS. RICCI:  We were able to identify 22 through

19   the documents, through the records that they submitted in

20   the information request.  And then, but there were 33 based

21   off of other records that we think -- well, 33 in total.

22          So 22 for certain, and 33, so an additional 11

23   more --

24          THE COURT:  Beginning when?

25          MS. RICCI:  Those go back to, I believe, 2020 or

1    2021.  I'm sorry.  I'm blanking on the exact time.

2                THE COURT:  So 2021.  But back to my original

3    point.  Do you know when Republic Steel started utilizing

4    this Flexcast VTD and the process in which they added the

5    lead which created the emissions that are the problematic

6    emissions?  Do we know when they begin doing that?

7                MS. RICCI:  I do not know for certain, but again,

8    it's my understanding that that's how the leaded

9    steel-making process works.  So I would -- I am going --

10               THE COURT:  Isn't that part and parcel of the

11   problem, counsel?  If this has been going on for many years,

12   and you don't know, or can't tell me, isn't that

13   problematic?

14        If Republic Steel has been using this process and

15   emitting lead in the air for many years unknown to the EPA,

16   isn't that something that would cause or give rise to

17   concern?

18               MS. RICCI:  Absolutely, Your Honor.  And that's

19   why we moved very -- as diligently -- we proceeded as

20   diligently as possible and as expeditiously as possible in

21   this case to resolve that issue once EPA became aware of it.

22               THE COURT:  So why don't you know about the

23   emissions previous to 2020?

24               MS. RICCI:  There were not inspections and there

25   aren't records of it.

1          THE COURT:  So wasn't Republic Steel required to

2     create records or keep records to give us information about

3     those earlier emissions?

4          MS. RICCI:  Yes, Your Honor.  And that's also why

5     we have a claim for the failure to do, you know --

6          THE COURT:  So they haven't been giving you, or

7     wasn't giving you, the information that would give us,

8     again, knowledge of how many previous emissions of lead

9     there have been in that general area?  Right?

10          MS. RICCI:  We do not have full history of the

11     records, correct.  That's, again, why one of our claims is a

12     violation for failure to do the performance tests to

13     demonstrate that those controls are working, that's never

14     been done at the facility, and to also provide -- to do

15     accurate -- to do proper monitoring, recording and

16     recordkeeping at the facility.  That's why it's part of our

17     claim.

18          THE COURT:  But this is important because part

19     your claim is, what you're seeking here, is a remedy going

20     forward.

21          These are the steps that you believe should be

22     required of Republic Steel to address what is of

23     environmental concern, the release of lead into the air in

24     that community, right?

25          MS. RICCI:  Correct.

1      THE COURT:  But you don't have -- again, we'll

2   get there, but all the comments and the commentators have

3   talked about the harm to the community, the neighborhood,

4   all of the harm that would flow from the release of lead

5   into the air in that area.

6      MS. RICCI:  Your Honor, which is why, again, we

7   moved as expeditiously as possible to prevent this from

8   occurring any further.

9      THE COURT:  That's important, but what about the

10  emissions that have been ongoing for many, many years in

11  that community, the lead that's been released in the air?

12      I'm sure you've read the comments, the commentary

13  about how many schools there are in that area, how many

14  young children there are, the harm from lead into the

15  community.

16      And we don't know when it began?  We don't know when

17  the emissions began, how long the lead has been released

18  into the air in that area?  Is that where we're at?

19      MS. RICCI:  Your Honor, I think we can assume

20  that it's been since they've been operating because they

21  have not had these controls in place.

22      THE COURT:  So that means going as far back as

23  2004?

24      MS. RICCI:  I believe that is the date.  I have

25  that in my mind, but I can get back to you and provide that

1  to you.

2  THE COURT:  So 20 years or thereabouts, or not

3  quite 20 years, we've had lead emissions into the air in the

4  neighborhood around Republic Steel?

5  MS. RICCI:  I know that -- yes.  I mean, 2004 is

6  when they applied for their permit to run the Flexcast VTD.

7  So yes.  I can say that since 2004 they were required to

8  have these controls in place and run performance testing

9  and, you know, all related monitoring requirements.  So yes.

10  THE COURT:  But they haven't been running all

11  those tests as required according to this agreement.

12  MS. RICCI:  They've never done a performance

13  test, no.

14  THE COURT:  They've never done a performance

15  test?

16  MS. RICCI:  No, Your Honor.

17  THE COURT:  What would the performance test show

18  us if they had done the testing?

19  MS. RICCI:  The performance test which -- so if

20  you look at what we're requiring to satisfy that claim for

21  failing to do it in our consent decree, the performance test

22  that we would require would be an EPA-approved one that

23  runs -- so after they've installed the requisite pollution

24  controls, they then run a performance test with an

25  EPA-approved method that demonstrates that the controls are

1    adequately controlling --

2              THE COURT:  Weren't they supposed to be doing

3    testing all along?

4              MS. RICCI:  They were required under their permit

5    to have done performance testing within six months of

6    installation and every five years thereafter.

7              THE COURT:  And did they do that?

8              MS. RICCI:  They did not.

9              THE COURT:  They did not?

10             MS. RICCI:  They have never done performance

11   testing.

12             THE COURT:  Never?

13             MS. RICCI:  No.

14             THE COURT:  So they've been in violation of their

15   permit now for what, 20 years?

16             MS. RICCI:  Yes.  But the reason it only goes

17   back for five years for Claim 1, for that violation -- or

18   I'm sorry, for Claim 2, for the failure to do the

19   performance testing, is because of the statute of

20   limitations issue.

21        So we go back for five years on that claim.  But ever

22   since, as we laid out in our papers, too, ever since they

23   have had that permit they have not conducted performance

24   testing.

25             THE COURT:  So, again, my apologies for diverting

1    you.  We'll go back to your presentation in a moment.

2         So the question that is -- in the papers it's been

3    raised by the commentators, is the harm to the surrounding

4    community.  I mean, do all those folks in that neighborhood

5    know that for 20 years, thereabouts, there has been lead

6    emissions into the air?  And we don't know whether

7    they've -- at what level because there has not been testing

8    done as required by the permit, right?

9              MS. RICCI:  Correct.

10             THE COURT:  So did the EPA think about, perhaps,

11   as part of this case, requiring notice, specific notice, not

12   just some generic notice, but specific notice to schools, to

13   homeowners, to parents, saying, by the way, this has

14   occurred, this has occurred over a period of time and there

15   has been lead emissions into the air which may affect the

16   health, safety, and welfare of the community, including your

17   children, yourselves, your homes, your soil, and we believe

18   that testing should be required.  We're going to

19   require -- we're going to set up testing so that we can make

20   sure that we are doing it.  We're not going to ask the State

21   of Ohio to do it.  We're not going to defer.  We're not

22   going to say, well, this is a matter for the Canton Public

23   Health Department or the State of Ohio.  This is a matter,

24   we, EPA, we're going to see to it that there are appropriate

25   steps taken to make sure that there has not been any

1    extraordinary harm done to the community at large.

2         Has that been considered here?

3         MS. RICCI:  Not that exactly.  But what we did

4    do, Your Honor, is after -- as soon as we filed the notice

5    of lodging, we did community outreach of sharing a summary

6    of what the settlement entails and a history about the case

7    and then the press release.

8         And we shared that with stakeholders in the community

9    and worked with Canton Department of Health to help us

10   facilitate getting that community outreach out to the

11   members in the Canton --

12        THE COURT:  So the taxpayers in Stark County

13   should be responsible then for taking the steps to try to

14   determine whether or not there has been any harm or the

15   extent of that harm from these lead emissions?  Is that what

16   we're doing here?

17        MS. RICCI:  No, Your Honor.  I simply worked in

18   coordination with her to identify the stakeholders.

19        THE COURT:  Well, doesn't the EPA have the

20   authority to step up and say we're going to require, in the

21   face of what we believe to be unlawful emissions, we're

22   going to require testing, ongoing testing of air, we're

23   going to test the soil, we're going to have these children

24   tested, we're going to have -- that kind of work done?

25   Don't you have the authority to do that?

1           MS. RICCI:  Definitely EPA definitely has the

2      authority to do soil testing, Your Honor.

3           And as one of the commenters requested, that EPA do

4      conduct soil testing, we actually made that request to EPA

5      Region 5 Superfund office to, you know, go to the area in

6      Canton and do the soil testing.

7           THE COURT:  Okay.  What about the children?  What

8      about the folks -- again, you read the papers.  I mean,

9      there has been -- it's been laid out here.  There has been

10     some very substantial comments made.

11          And the response to them, with all due respect, is

12     kind of we'll just brush them aside.  Well, we can't really

13     apply this 990,000 to be utilized for all of the harm that

14     may have been done in the community.  We can't do that.  So

15     we're just not going to deal with the comments more or less.

16          Well, the comments are much broader than that.  The

17     comments have asked for specifically, said, why are we not

18     providing a remedy for this past, you know, harm to the

19     community here?

20          The community -- I'm quoting from the Center for

21     Healthy Housing.  "The community deserves to be protected

22     from the contamination caused by previous emissions, in

23     addition to the settlement."

24          "Although the consent decree may be expected to

25     minimize future emissions, assuming Republic Steel complies,

1    we are submitting these comments because the consent decree

2    will do nothing to address the likely contamination of homes

3    and yards caused by past emissions."

4         And, "We request that EPA conduct or require soil and

5    dust sampling and if necessary to clean up the

6    contamination."

7         They go on.

8         That's Exhibit 2, I believe.  That's a fairly detailed

9    letter.

10        More detailed, and more to the point, is the comments,

11   Exhibit 3, Comment from the Community Legal Aid Services.

12   It's compelling.  He outlines the neighborhood.  This is a

13   poor neighborhood with primarily black children.

14        Elevated blood levels -- there is a thorough analysis

15   of the harm that flows from lead.

16        And the proposed consent -- here is the comment.  And

17   you -- I'm sorry.  I apologize.  Don't mean to be

18   harsh -- you just brushed it aside and said, well, we can't

19   give the 990,000 to be used for any other things, and making

20   sure it goes to the government.

21        His request is the proposed consent decree should be

22   modified to ensure that funds are available to the community

23   affected by Republic Steel conduct.

24        Did you read that?

25             MS. RICCI:  Yes, Your Honor.

1        THE COURT:  And he spells it out here, which is

2    my concern in many ways about this decree.  It says, "As

3    discussed above, average blood levels today are highest in

4    poor communities of color."

5        Do we have any dispute that the communities around

6    Republic Steel are poor communities?

7            MS. RICCI:  No, we do not, Your Honor.

8            THE COURT:  Is there any dispute that most of

9    them are communities of color around that area?

10            MS. RICCI:  No, we do not.

11            THE COURT:  So I'm sorry.  But I have grave

12    concerns about what we're doing here and why it is that

13    we're not thinking about -- going forward, that's all

14    important because obviously that should be done.

15        But as I'm reading these papers and I'm hearing you

16    today, this has been ongoing for 20 years, there has been a

17    violation.  I know the statute is only five years.  But go

18    forward and explain to me how this consent decree addresses

19    all of those concerns as raised by the commentators and how

20    they address, again, how it is that this 990,000 is

21    reasonable in the face of what we have here before us.

22            MS. RICCI:  I can turn --

23            THE COURT:  Sorry to divert you, but these are

24    all the real essential issues here, counsel.

25            MS. RICCI:  Absolutely.

1           I can address a couple things that you raised there.

2           As we stated in our response to comments and in our

3    motion for entry, because that $990,000 has been designated

4    as a civil penalty, we are obligated to deposit that with

5    the United States Treasury.

6           It has been -- we are not able to go back and

7    renegotiate a penalty after it's already been determined a

8    civil penalty.

9                THE COURT:  So what's the purpose of the penalty,

10   to get diverted here a little bit?  So what's the purpose of

11   the penalty?

12                MS. RICCI:  The purpose of the penalty here which

13   was achieved in this case is to recoup the economic benefit

14   of noncompliance which the penalty does here, and that --

15                THE COURT:  How do you compute that, by the way?

16   What's the economic benefit from -- you're going to use five

17   years, but someone could say, well, it's been 20 years that

18   they've been running this process.  So how do you arrive at

19   the figure of 990,000?

20                MS. RICCI:  Well, so --

21                THE COURT:  What's the economic benefit?  What

22   process did you use to come up that 990,000 was the economic

23   benefit received by Republic Steel?

24                MS. RICCI:  So the economic benefit looks at the

25   amount that defendant, you know, would have spent had they

1    been complying.

2                     THE COURT:  Spent on?

3                     MS. RICCI:  On the proper --

4                     THE COURT:  Compliance?

5                     MS. RICCI:  Yes, on the compliance controls.

6                     THE COURT:  So it doesn't focus on the amount of

7    profit that they made from running this process, the steel

8    that was made and sold?

9                     MS. RICCI:  Well, it prevents them from profiting

10   from that wrongdoing of not being in compliance.

11        And so with our civil penalty here, it recoups the

12   full economic benefit.  It's actually -- the total penalty

13   is more than three times the economic benefit, Your Honor.

14                    THE COURT:  The economic benefit again is what?

15                    MS. RICCI:  The economic benefit was almost

16   270,000.

17                    THE COURT:  Which is?  Is it -- I'm sorry.  Maybe

18   I'm misunderstanding.

19        Is the economic benefit what it would have cost them

20   to comply with the law and put in place the monitoring and

21   do what needs to be done or should have been done?  Is that

22   what the economic benefit is?

23                    MS. RICCI:  Yes, the economic benefit, yes, is

24   what they should have spent to have been in compliance.

25                    THE COURT:  So that's the theory.  My apologies.

1        Would not a better theory be, wait a minute, you've

2    run this mill in violation of the law for we'll use your

3    five-year statute, so we want to see how much you've made

4    and what profit you've gained from running this process in

5    violation of the law?

6        Would that not be a more appropriate measure when you

7    talk about a penalty?  Right?

8        Would that not be more appropriate, rather than say

9    we're just going to fine you for doing what you should have

10   done anyway to comply with the law?

11              MS. RICCI:  Well, Your Honor, that's why the --

12              THE COURT:  What kind of penalty is that?

13              MS. RICCI:  That's why the penalty has more

14   components than just the economic benefit, right.

15       So in this case, again, the civil penalty is more than

16   three times the economic benefit.  And courts have affirmed

17   that a penalty that is two to three times the economic

18   benefit is sufficient because that achieves the necessary

19   punishment and deterrent effect.

20              THE COURT:  Really?  So what's the gross revenue

21   of Republic Steel every year?  Or what was it in 2020, do we

22   know?

23              MS. RICCI:  I do not know that, Your Honor.

24              THE COURT:  Millions?  Hundreds of millions?

25              MS. RICCI:  I do not know that, Your Honor.

1          THE COURT:  So we didn't think about that when we

2     think about 990,000 as a penalty and how effective that's

3     going to be as a deterrent?

4          MS. RICCI:  We thought about things such as the

5     size of the violator.  We thought about -- those -- so other

6     penalty factors that go into it, right, so the gravity, the

7     length of the violation, the seriousness of the harm.  That

8     made up the other two-thirds of the penalty.

9          So really the economic benefit is just one-third.  And

10     then the other two-thirds are all those other factors that

11     went into the calculation to arrive at what the penalty is,

12     the civil penalty is.

13          THE COURT:  Okay.  And you think this will have a

14     deterrent effect on others who wish to pollute or may

15     pollute or may not comply with their monitoring

16     requirements, etcetera?

17          MS. RICCI:  I think based off of the Clean Air

18     Act penalty policy, I think yes.

19          THE COURT:  So you made no effort to see what may

20     have been the economic benefit?

21          We will disagree as to what that standard should be,

22     the economic benefit, meaning how much money is Republic

23     Steel making out of this mill if they're running this

24     process and they're doing it and emitting lead into the

25     community?

1           Do we not want -- do we not want to know what their

2     profits may be, what their profit margin is on that plant?

3           MS. RICCI:  Your Honor, we did the economic

4     benefit analysis as it's laid out for us to do under Clean

5     Air Act and EPA penalty policy and the Clean Air Act

6     statutory guidance for its policy.

7           THE COURT:  That doesn't bind me, does it?

8     That's your policy.  That doesn't bind the Court in making a

9     final determination about whether this is reasonable and

10    meets all the appropriate standards.

11          MS. RICCI:  Again, because the penalty recovers

12    more than three times the economic benefit, we believe that

13    that is sufficient.  And courts have affirmed that a penalty

14    that is two times the economic benefit is sufficient.

15          THE COURT:  Well, what is the penalty?  What's

16    the daily penalty?

17          According to your papers it could be as much as what,

18    $100,000 a day or more?

19          MS. RICCI:  For a violation, correct, that's

20    under the Clean Air Act and with inflation.

21          THE COURT:  So here how many days was there a

22    violation?

23          MS. RICCI:  So for Claim 1, we alleged -- we did

24    a calculation of the, again, the 22 degassing events that we

25    had data for over a four to six month period, and we ran

1    that for the five years going back.

2              THE COURT:  So how much per day then was the

3    penalty?

4              MS. RICCI:  In that calculation, Your Honor, I do

5    not have that information in front of me.

6              THE COURT:  Well, if I took the $990,000 and

7    broke that down, how would this break out?  How much per day

8    if I were to use that number?

9              MS. RICCI:  I am not sure.

10             THE COURT:  I don't have a calculator, I'm not

11   real quick at math, but if I broke it down to what, 22

12   emissions and 990,000, divide that up, or 33 emissions and

13   divide that up, how much would that be per day?

14        We can do the math.  It's not that much, is it?

15             MS. RICCI:  I'm sorry, Your Honor.  I do not have

16   that calculation.

17             THE COURT:  Well, you can impose up to

18   125 -- according to your papers, $125,000 a day or

19   thereabouts, right?

20             MS. RICCI:  Under the Clean Air Act penalty

21   policy.  But Your Honor, this was a settlement.  And

22   typically when you're negotiating penalty and consent decree

23   to avoid litigation and the uncertainty that's involved in

24   litigation, the penalty is going to be much lower than

25   what's in the Clean Air Act penalty, under the statute under

1     the Clean Air Act.

2            THE COURT: It's $109,000 per violation per day

3     for each day the violation occurred. That was after

4     November 2, 2015, according to your papers.

5         I'm sorry. Go ahead.

6            MS. RICCI: As I was saying, Your Honor, there

7     are three claims in the United States' complaint. They are

8     all related to that Flexcast VTD unit. They're resolved by

9     stringent EPA compliances that have those approvals for each

10     place -- or each step in the consent decree.

11         I would like the court to know that throughout the

12     negotiations, the United States insisted upon a number of

13     non-negotiables in the settlement.

14         We insisted that there was a timely schedule for

15     implementation and that those rigorous EPA approvals were

16     incorporated in each step which, during the direct testimony

17     of Mr. Prentice I will pull that up and show you, show the

18     Court how that plays out.

19         And the United States insisted upon EPA-approved

20     performance testing of those controls, and that they must do

21     that performance testing during the operations with the

22     highest lead emissions which were what we were discussing

23     earlier, those degassing events.

24         And finally, the United States insisted that the

25     parameters that EPA approves for how the controls are

1    operated, that they must be incorporated into Republic

2    Steel's Clean Air Act permits in order to ensure compliance

3    even long after the consent decree is terminated.

4         Now, Your Honor, the settlement properly addresses all

5    of the violations.  It resolves the United States' claims.

6    It secures an adequate civil penalty for Republic Steel's

7    violations.

8         And Your Honor, I would like to mention that even two

9    out of the three of the public commenters supported

10   settlement and expressed that they wanted the consent decree

11   to be entered.

12              THE COURT:  Is that how you read it?

13              MS. RICCI:  If you look at the National Center

14   for Healthy Housing, they led their comment, at the very

15   beginning of their comment, Your Honor, they said, you know,

16   none of the comments below should preclude entry of this

17   settlement.

18        And the mayor's comment, he thanked us for our work

19   and thanked us for the proposed settlement.  And his was

20   more of a question of asking us if any of the penalty money

21   could go back into the community.

22        So I would say that, yes, one of the commenters

23   directly said their comments should not preclude entry.

24        And I think the mayor, by thanking us for our work and

25   the settlement and saying he didn't have a comment but he

1     had a question, I would interpret that to mean that he would

2     want the consent decree to be entered.

3                  THE COURT:  Well, the Center for Healthy

4     Housing -- we can debate it back and forth -- yes, they say

5     the consent decree, obviously they agree that it should be

6     entered.  None of the comments should delay the entering of

7     the consent decree, however -- they qualify that, and what I

8     think is an important qualification.  "Although the consent

9     decree may be expected to minimize future emissions," and

10    I'm quoting, "assuming Republic Steel complies, we are

11    submitting these comments because the consent decree will do

12    nothing to address the likely contamination of homes and

13    yards caused by past emissions.  The community deserves to

14    be protected from contamination caused by previous

15    emissions, in addition to this settlement."

16          So they're not satisfied with the terms of the consent

17    decree.  They're noting that, indeed, going forward Republic

18    should do what it's required to do and has been required to

19    do, and that is monitor, right, the emissions?

20          But they're not satisfied with the decree, nor is the

21    other group that I think does an outstanding job of calling

22    to all of our attention the problem here, Community Legal

23    Aid.

24          They simply state -- they're asking that the 990,000

25    be diverted for causes related to the contamination.  But

1    generally speaking, their position is that more needs to be

2    done.  They're asking it to be modified.  They're not asking

3    it to be entered.  They said it should be modified to ensure

4    that funds are available to the community affected by

5    Republic Steel's conduct.

6            So to say that they all support the entry of the

7    decree is a bit of a stretch.

8            As far as the mayor, I don't know what the mayor knows

9    or doesn't know, to be frank with you, about this and this

10   whole process, how much, again, consultation has been

11   undertaken.  So I don't know the answer to that question.

12           And I don't know how many people are fully aware of

13   what gives rise to this settlement.  I would be curious to

14   know whether all of these stakeholders -- after today's

15   hearing, maybe they will know more about how long this has

16   been ongoing.

17           I mean, do they know that arguably this has been,

18   these emissions have been ongoing into the community for 20

19   years?  Are they aware of that?

20                MS. RICCI:  In our complaint, Your Honor, we

21   state that they have had this permit, Republic Steel's Clean

22   Air Act permit has been in place since 2004 and they have

23   not had compliance or run performance testing.  So that's in

24   our papers.

25                THE COURT:  Counsel, a layman who reads this or a

1   homeowner, or even a teacher at a school, would not know.

2   It is not directly -- does not directly state in layman's

3   terms where a layman or someone unschooled in the law would

4   know that what's been going on here has been ongoing for 20

5   years, a violation of their permit, as you've laid out for

6   me here.

7        They've not been monitoring this.  And they've been

8   emitting this lead into the community, arguably, according

9   to you, for decades now, to the community.

10       And you first discovered it -- when I say "you," the

11  EPA first discovers it in 2020.

12       And so you can go forward, but the issue is here, as I

13  see it, is not what we're doing going forward, because

14  that's what the consent decree addresses, is what needs to

15  be done to remedy these past violations, meaning to prevent

16  this from continuing to occur.

17       But the problem is, is that what you have proposed

18  here -- two issues.

19       Number one, is the economic -- the penalty sufficient

20  to address these violations?  Is $990,000, looking at the

21  statute, the amounts available to you, the nature of the

22  violation and the harm, is that adequate?  Number one.

23       Number two is, have you put in place or have you

24  negotiated remedies to address the harm to the community

25  there in the face of a poor community of color, individuals

1    in that whole neighborhood that have been adversely impacted

2    for years?

3            MS. RICCI:  To your first --

4            THE COURT:  I mean, someone could do studies, if

5    someone really wanted to delve into that, and say let's take

6    a look at past performance in the schools in that community,

7    in that area.  Is it possible that some of these children

8    who have learning disabilities, is it possible that some of

9    that may have been a result of exposure to lead?

10           I mean, 20 years is a long time.  Even five years.

11           Has the EPA done any of those kind of things?  Have

12   you done studies?  Have you done anything to try to see what

13   harm may have flowed from all of this?

14           MS. RICCI:  I am not aware of any, Your Honor.

15           THE COURT:  Suppose I'm a homeowner in this

16   community and it becomes apparent -- I learn that my home

17   and my neighborhood has been exposed to lead, lead exposure

18   now for the past we'll use five years.

19           So I decide I want to sell my home.  Well, I'm

20   required under Ohio law to use a real estate disclosure

21   form.  Now, do I have to disclose to the future buyers that

22   my home has been exposed to lead or there has been airborne

23   lead contaminants in the air for the past five years or

24   maybe even more?

25           So what do you think that does to the value of their

1    house when a prospective buyer looks at the disclosure form

2    and says, hmm, there has been lead in this area, in this

3    property.

4         Now, what does that do to the value of those

5    properties, do you think?

6         MS. RICCI:  Your Honor, I am not sure, but I

7    think --

8         THE COURT:  Well, then maybe the EPA might think

9    about, well, gee, do we have available the ability to remedy

10    those harms or to require Republic Steel to do that, to

11    require some remedy for the depreciation in the value of

12    those homes along with the possible risk of health, harm to

13    the children?  And the others?  Not just the children, the

14    elderly is part of this process, too, right?

15         MS. RICCI:  Yes, Your Honor.

16     I just -- I want to mention, though, that our focus in

17    this case, which is clear by the timeline that we moved, was

18    really to prevent these emissions from occurring.

19         THE COURT:  Going forward.

20         MS. RICCI:  Correct.  And in order to do that,

21    we, again, negotiated swiftly, got a consent decree in

22    place, negotiated a civil penalty, and moved for entry so we

23    can get those controls in place.

24         THE COURT:  That's fine, counsel, but that

25    doesn't preclude you -- they're required by law at this

1    point, by their permit, to be doing this ongoing monitoring

2    irrespective of the consent decree.

3           Yes, you've put in place some stringent requirements.

4    But they've been required to do this all along and have not

5    done it, according to you and according to the settlement.

6           So that's sort of something hopefully they're doing

7    now as they're required to do.

8           But part of the process is, part of, I would think, in

9    these cases -- and hopefully, there is others that are out

10   there, hopefully part of the process is going to be to make

11   sure, to promote the public health and welfare.

12          That's part and parcel of what's gone on here in the

13   past.  Part and parcel of protecting the health and welfare

14   is to say a couple of things, that the penalty is going to

15   be sufficient to be a deterrent, number one.

16          And number two, as your complaint says, the standard

17   was established to provide public health protection,

18   including the health of sensitive populations such as

19   asthmatics, children, and the elderly.  That's paragraph 12

20   of your complaint.

21          And now we have to ask ourselves, we've got

22   information provided to you by the commentary, or comments,

23   that there is concerns about health, safety, and welfare of

24   that community.

25          And the EPA, as I read it, you're just choosing to

1     punt on that.  That's, well, maybe somebody else will deal

2     with that.  That's how I read your papers, is saying maybe

3     that will be addressed by someone else or maybe we'll

4     address it in the future.

5          Am I mistaken?

6          MS. RICCI:  Your Honor, we, again focused on the

7     most significant source and the concern, stopping those

8     excess emissions.

9          And no.  We're not saying that we maybe will.  We are

10    saying that entry of the consent decree is not going

11    to -- it doesn't limit our ability to enforce any additional

12    violations.  And it doesn't limit any of the programs that

13    are in place or any of the other options that are in place

14    to address health concerns.

15         THE COURT:  So why not do it now?  Why not say,

16    look, as part and parcel of this, we now know of these

17    violations.  We know that there had been lead emissions made

18    into the air in that community.  We know it's been for at

19    least five years.  Even though the statute is five years, we

20    know it's been ongoing possibly for as long as 20 years.  We

21    know all of that.

22         And so as part of this we are going to require you,

23    Republic Steel, to step up to the plate and do the things

24    that need to be done to protect and mitigate the possible

25    harm to the community and that area, that poor community of

1    color.

2            Who speaks for them?  Does the EPA speak for them or

3    not?

4                    MS. RICCI:  The EPA, their mission is to protect

5    public health and the environment.

6                    THE COURT:  Right.  So who is going to speak for

7    them in terms of what's happened here and the harm that's

8    been visited on that community?

9            Is anybody going to speak for them but for the

10   commentators we've had come here?

11           I'm going to take a break, and you can gather your

12   thoughts and decide how you're going to proceed with this

13   matter.

14           I'm sorry, but I've read all these papers.  I read

15   them repeatedly.  And I've looked this over and I just

16   cannot -- quite frankly, those issues are first and foremost

17   in my mind.

18               We'll take about 15 minutes.

19               Thank you very much.

20            (Recess taken, 11:15 a.m. until 11:30 a.m.)

21                    THE COURT:  All right, counsel.  Go ahead,

22   please.

23                    MS. RICCI:  Thank you, Your Honor.

24           I next wanted to do the direct examination of the EPA

25   engineer, Mr. Dakota Prentice.  I think by doing that you

1      will see that the settlement contains measures that go

2      beyond Republic Steel's requirements under their Clean Air

3      Act and under their permit.  So it will show you how the

4      settlement further is in the public interest because it's

5      more than just what they're required to do under the

6      statute.  It requires more of them.

7           And he can also answer some of the technical questions

8      that I wasn't able to articulate as well as he absolutely

9      can.

10          But before I do that, it's my understanding that

11     Republic Steel's counsel would like to address a few points

12     from earlier.

13               THE COURT:  We'll do it one at a time.  You can

14     complete your presentation.  Then I'll hear from Republic

15     Steel.  They can make their presentation.  I think that's a

16     little more organized, please, for me.

17               MS. RICCI:  That sounds great.

18          Your Honor, then if I may, may I please call Mr.

19     Dakota Prentice to the witness stand.

20               THE COURT:  Sure, you may.

21          Sir, if you'd approach the witness stand and please

22     remain standing while I administer the oath or affirmation.

23                    DAKOTA PRENTICE,

24        of lawful age, a witness called by the United States,

25          being first duly placed under oath, was examined

1              and testified as follows:

2              THE COURT:  Sir, have a seat in the witness

3    stand, if you would, please.  Adjust the microphone so your

4    testimony can be heard.

5         Thank you.

6         Counsel, you my inquire.

7              DIRECT EXAMINATION OF DAKOTA PRENTICE

8    BY MS. RICCI:

9    Q.   Mr. Prentice, let's start off by discussing your

10   background.  What is your education background?

11   A.   Sure.  I have a Bachelor's Degree in Chemical

12   Engineering from the University of Illinois.

13        Following that I went to Northwestern for a Master's

14   Degree in Environmental Engineering.

15   Q.   What is your engineering work experience?

16   A.   From 2003 for 2011 I worked for a company called

17   Pioneer Engineering doing general environmental consulting.

18   And from 2011 to today I've been with the EPA.

19   Q.   What is your current role at EPA?

20   A.   I am a Clean Air Act stationary source inspector.

21   Q.   What region are you in at EPA?

22   A.   Region 5.

23   Q.   And what area does Region 5 cover?

24   A.   We cover six states, including Ohio.

25   Q.   And how many air inspectors are there in your

1    particular branch of the EPA?

2    A.    I'm one of 30 inspectors for Region 5.

3    Q.    And what do you do in your current role as a Clean Air

4    Act inspector?

5    A.    As an inspector, I visit facilities and I work to

6    determine if they are in compliance with their permit and

7    any other regulations that they're subject to.

8    Q.    How many inspections have you conducted as a Clean Air

9    Act inspector at EPA?

10    A.    A few hundred.

11    Q.    Mr. Prentice, have you inspected the Republic Steel

12    Canton facility?

13    A.    Yes, I have.

14    Q.    And what type of facility is the Republic Steel

15    facility?

16    A.    It is a steel mill, like a mini mill as we refer to

17    them, that produces various grades of steel, including a

18    leaded steel alloy.

19    Q.    And what's leaded steel?

20    A.    Leaded steel is an alloy of steel.  Republic adds a

21    certain amount of lead to the steel to meet the specs that

22    their customers need.

23    Q.    And are there emissions from the leaded steelmaking

24    process?

25    A.    There are, yes.

1   Q.    What emissions result from this process?

2   A.    Emissions that you would see at any other steel mill,

3   but with Republic, there is the addition of lead because

4   they're producing a leaded alloy.

5   Q.    And how is this process for leaded steelmaking

6   regulated?

7   A.    They have a permit-to-install issued by Ohio EPA.

8   That was from 2004.

9   Q.    And what are some of the requirements in Republic

10  Steel's permit-to-install?

11  A.    They have lead emission limits, and then they have

12  testing requirements and monitoring requirements as well.

13  Q.    Now, who joined you in conducting that inspection of

14  the Republic Steel facility?

15  A.    I was joined by David Sutlin, another EPA inspector.

16  Q.    And when did that inspection occur?

17  A.    That was in September of 2021.

18  Q.    And what did you observe during the inspection?

19  A.    We observed steel production, sort of from the

20  beginning to the end.

21        We also observed, at a vacuum tank degasser, we

22  observed the production of leaded steel.  That's the unit

23  where lead is added to the molten steel.

24        And we also observed a degassing event.

25  Q.    Okay.  Thank you.

1          So here on the PowerPoint you'll see this is a diagram

2     of a Flexcast VTD.  This isn't exactly Republic Steel's, but

3     this is a diagram of what one looks like.

4          So let's discuss the VTD and the steelmaking process,

5     Mr. Prentice.

6          Can you explain how the steelmaking process works?

7     A.   Sure.  So at the vacuum tank degasser, this is a unit

8     that Republic uses to remove impurities from the molten

9     steel, which would be dissolved gases.

10         So a ladle of molten steel moves to the VTD.  It is

11    placed within it.

12         The top is then put back on, and a vacuum is induced

13    within the unit.

14         While the vacuum is being induced, argon gas is being

15    bubbled through the steel.  The argon gas works to mix the

16    steel.

17         And due to that low pressure within the VTD, these

18    dissolved gasses are removed from the steel, increasing the

19    quality of the steel.

20         This is also the point where sort of at the end of the

21    VTD cycle, lead is introduced to the molten steel for the

22    first time.

23         And any emissions from this process go out on the left

24    side there where it says "to vacuum pump."  That's how the

25    emissions leave the system.

1    Q.    And you mentioned degassing events.  What are

2    degassing events?

3    A.    So if -- once the leaded steel has been produced, they

4    want to go and cast that next.

5          If the lead has already been introduced to the steel

6    but there is a problem downstream that prevents them from

7    casting it, that steel begins to cool fairly quickly.  And

8    after a certain temperature drop, they can no longer cast

9    that steel.

10          That steel has to be reheated.  And before they reheat

11    that, that ladle of steel, of the leaded steel, it's brought

12    back to the vacuum tank degasser.  It's brought under vacuum

13    again.  And that lead is sort of vaporized or boiled off to

14    some degree.

15          But it's removed from the steel and is routed through

16    the emission control system at the VTD.

17    Q.    And is this here on the screen, that's where you're

18    discussing that it gets routed to, correct?

19    A.    Right.  And this is not exactly how Republic's system

20    is set up but it gives the general idea here.

21    Q.    And can you explain what happens here when it's

22    emitted through?

23                THE COURT:  You can touch the screen, sir, if you

24    want, and that will give me some indication of what's

25    transpiring.

1          THE WITNESS:  Sure.  All right.  So the gas is

2     coming out of the -- let's see.  I'm trying to touch but

3     it's not working.

4          THE COURT:  I'm sorry.  It's not working, the

5     technology.  Apparently we're having a problem.

6          Go ahead.  You can describe it.

7          THE WITNESS:  All right.  So the emissions that

8     are coming out of the VTD, they're coming into this

9     first -- it's described as W-Booster on the upper left side.

10    It's coming into the left side of that unit.

11         This is described as a booster here, but it's a steam

12    ejector.  And Republic uses steam ejectors to induce the

13    vacuum within the VTD.

14         And the steam is brought into the ejector, and it

15    pulls on the contents of the VTD.  And that's how the vacuum

16    is induced.

17         But the emissions coming off of the VTD, they enter

18    that steam ejector, and they become mixed with the steam

19    that's creating the vacuum.

20         So now we have this mixed stream moving through a

21    series of ejectors, steam ejectors.  And they eventually

22    will move to condensers.  At the condenser, they try to get

23    that steam to drop out as water.

24         And so at the condenser we'll see a split.  We'll have

25    water drop out, and we'll have gas leave the condenser.

1          The water, though, has been in contact with the

2     emissions from the VTD.  And so that will be a leaded water

3     at that point.

4          So we have leaded water, or lead impacted water,

5     dropping out, showing -- moving to the hot well.

6          From the hot well, that water is pumped to the cooling

7     tower so it can be cooled and then recirculated.

8          But at the cooling tower there are emissions.  So that

9     leaded water results in the cooling tower being a lead

10    emission source.

11         And then separately, the gas stream that's not

12    condensed at the condenser will eventually move up and out

13    of the system through the vacuum tank degasser stack.

14    Q.    Thank you for explaining that in much better detail

15    than I could.

16         Were there any additional follow-ups with Republic

17    Steel after your inspection?

18    A.    After the inspection we followed up with an

19    information request, and followed that up with a notice of

20    violation.

21    Q.    And how did the inspection or the information request

22    focus EPA's enforcement action in this matter?

23    A.    Based on what we saw we were very focused on the VTD

24    because it seemed to be the primary source of lead emissions

25    from the facility.

1    Q.    And so you said then EPA issued a notice of violation.

2          What were the claims in the notice of violation that

3    EPA issued to Republic Steel?

4    A.    Yeah, so we alleged that they, during the degassing

5    events, that they would be exceeding their lead emission

6    limit.  But only during these degassing events.

7          And then second, that they failed to ever conduct a

8    performance test to show that they were in compliance with

9    their lead emission limits.

10         And three, that based on some records we obtained,

11   that the facility was failing to conduct the required

12   monitoring per the permit.

13   Q.    And why are there only claims that are related to the

14   VTD?

15   A.    Because, again, that was what we thought -- we viewed

16   it as the most significant lead emission source.  And other

17   portions of the facility had been dealt with by the state

18   through various other orders.

19   Q.    So you issued the NOV, and then you had what's called

20   an NOV conference and discussed that, the notice of

21   violation with Republic Steel.

22         What occurred during that conference?

23   A.    At that conference Republic proposed two projects to

24   reduce lead emissions.

25         They proposed improvements to the VTD stack.  This

1   would be where the gas stream exits and is an emission from

2   the VTD.

3        They proposed adding a demister, or a cyclone,

4   followed by a HEPA filtration system.

5        And then separate from that, they proposed

6   improvements to the cooling tower through upgraded demisters

7   using a more modern technology and variable speed fans.

8   Q.   And the upgrades to the cooling tower are separate

9   from the VTD requirements?

10   A.   Correct.

11   Q.   And what did EPA think about these proposed projects?

12   A.   We thought they were good projects, and it appeared

13   that they would significantly reduce lead emissions from the

14   facility.

15   Q.   And when the government started negotiating this case

16   with Republic Steel, what was the government case team's

17   overall negotiation objective?

18   A.   We wanted those improvements to the facility to be

19   implemented as soon as possible to reduce lead impacts from

20   the facility, and we wanted a series of steps and safeguards

21   in place so that we knew it would happen in a timely manner

22   and that it would be done appropriately, and then to get a

23   penalty for the violations that we alleged.

24   Q.   And did the government case team negotiate a proposed

25   consent decree that would achieve those objectives?

1    A.    Yes.

2    Q.    Now, let's go over the compliance assurance features

3    that are in the proposed consent decree.

4          What are the compliance requirements that address each

5    violation?

6    A.    So for the exceedance of the lead emission limit, the

7    implementation of the new control technology, the demister

8    and HEPA filter, we believe will resolve that claim.

9          And then we have the claim for the failure to conduct

10   a performance test.  Well, after they add the demister and

11   HEPA filter system, they'll be required to conduct a

12   performance test so that we know that they are in compliance

13   with their lead emission limit.

14         And then for the failure to conduct appropriate

15   monitoring of operations, they will be required to have a

16   compliance management system which will have electronic

17   monitoring recordkeeping and notification for the facility.

18   Q.    And are there additional compliance requirements to

19   address lead emissions that are separate from the

20   violations?

21   A.    Yes.  This would include the improvement to the

22   cooling tower, the addition of -- or the replacement of the

23   old demisters with a more modern demister technology, and

24   the variable speed fans.  That cooling tower project is an

25   additional project.

1      They're also required to implement some electronic

2   monitoring of a separate baghouse that does control a lead

3   emission source associated with casting of leaded steel.

4      And then if they -- they also have another portion of

5   the plant referred to as the CBCF.  They have the ability,

6   through their permit, to produce leaded steel in that part

7   of the plant as well.  They're currently not doing that, but

8   if they were to do that at a future date, they are required

9   to notify us of that.

10  Q.   And what mechanisms are in place in the consent decree

11  so that EPA can verify the effectiveness of these compliance

12  requirements?

13  A.   We have a series of timelines and report submittals

14  and protocols that we need to see and approve as these

15  projects move forward.

16  Q.   So as an example, I would like to walk through the

17  provisions on the upgrades to specifically the Flexcast VTD

18  emission control system.  And this really will then

19  highlight the EPA review and approval process that you just

20  mentioned.

21      So I have here on the screen --

22          MS. RICCI:  Your Honor, this is ECF docket 2-1.

23  It's the proposed consent decree.

24  BY MS. RICCI:

25  Q.   And so I want to focus on the Compliance Requirements

1     section starting with paragraph 12.

2          So the first provision here requires Republic Steel to

3     install and operate the inertial separator and the HEPA

4     filter at the Flexcast VTD.

5          Let's focus here on paragraph 12A which states that

6     within 60 days of the effective date, defendant shall submit

7     to EPA for review and approval the Flexcast VTD control plan

8     that describes the pollution control system at the Flexcast

9     VTD, including the inertial separator and the HEPA filter,

10    and obtain EPA's approval of the overall control efficiency

11    of the pollution control equipment prior to installation.

12         Mr. Prentice, please explain what the control

13    efficiency is and why EPA wants to approve this prior to

14    installation.

15    A.    The control efficiency is how well a piece of control

16    equipment will remove a specific contaminant or pollutant as

17    that gas stream moves through it.

18         And that helps us understand what we should expect

19    when that piece of equipment is placed in operation.

20    Q.    And why does EPA want to approve this before

21    installation?

22    A.    We want to ensure that what is implemented will bring

23    them into compliance with their lead emission limit.

24    Q.    Okay.  So moving now to 12B.

25         It states here that defendant shall install and

1    commence operation of the inertial separator and HEPA filter

2    at the Flexcast VTD at the facility to aid in the control of

3    lead emissions from the Flexcast VTD.  The system shall be

4    consistent with the Flexcast VTD control plan prescribed in

5    the prior paragraph 12A.

6           This may be obvious, but what's the purpose of EPA

7    requiring this provision?

8    A.    So once the what we believe is good control equipment

9    has been proposed and we have approved it, we want them to

10   move ahead with installing and operating it as soon as

11   possible.

12   Q.    So then we move to the third stop.  That's paragraph

13   13, and this is the Compliance Demonstration Protocol.

14          And this requires that no later than 30 days after the

15   installation and commencement of operation of that inertial

16   separator and HEPA filter at the Flexcast VTD, defendant

17   shall submit to EPA for review and approval, a compliance

18   demonstration protocol for the Flexcast VTD emission control

19   system.

20          Mr. Prentice, can you please explain what this

21   compliance demonstration protocol is and how it will ensure

22   compliance?

23   A.    So the protocol will lay out the specific test methods

24   that will be used and the operating scenario that the tests

25   will be conducted under.

1     And specifically for us we want to ensure that this

2  control equipment is tested under a worst case scenario.

3  For us this would be degassing.  We want to know that if

4  this event occurs in the future when this control equipment

5  is in place, that we feel confident that they will be

6  meeting their lead emission limit.

7  Q.    And so EPA required this to ensure that, like you

8  said, the controls are operating effectively during the

9  times where there are the highest lead emissions from the

10  production?

11  A.    Correct.

12  Q.    And then if you move to paragraph 14, this requires

13  Commencement and Completion of Compliance Demonstration.

14     Can you explain this step?

15  A.    So once we have approved the protocol, we want them to

16  move ahead with that test as soon as possible so that we

17  know everything is working properly.

18  Q.    And how does -- okay.  And then the next provision,

19  paragraph 15, this is the Compliance Demonstration Report.

20     This report requires Republic to describe the

21  conditions under which -- under which the compliance

22  demonstration was carried out and the result of the

23  performance testing that you described that has to occur

24  under degassing and all the steps taken to comply with the

25  compliance demonstration protocol as well as submitting the

1    operating parameters to EPA for review and approval.

2           Mr. Prentice, how does the compliance demonstration

3    report help EPA verify the effectiveness and proper

4    functioning at the VTD emission controls?

5    A.    So we need to be sure that the actual test was

6    conducted as we approved in the protocol, so that the test

7    methods were performed appropriately and the operating

8    scenario that we asked for was also what occurred during

9    testing.  This would be the worst case operating scenario,

10   like a degassing event.

11          And if that is done appropriately and they are shown

12   to be in compliance with their lead emission limit, that

13   allows them to establish operating parameters to demonstrate

14   continuous compliance moving forward.

15   Q.    And what are operating parameters?

16   A.    Operating parameters are a physical characteristic of

17   a system that's easily measured.  And that whatever that is,

18   whatever is monitored, if you are in that range moving

19   forward, once that range is established, that allows us to

20   know that that equipment is operating properly and

21   consistent with how it demonstrated compliance during the

22   performance test.

23   Q.    So we just walked through just a portion of the

24   compliance requirements in the consent decree.

25          But there are similar provisions for EPA review and

1    approval that mimic what we just went through here

2    throughout the Compliance Requirements section for other

3    measures such as that cooling tower and the compliance

4    management system.  Correct?

5    A.    Correct.

6    Q.    And what are the compliance assurance measures to

7    ensure proper operation of the controls after they've been

8    installed and after they've been tested?

9    A.    So once that is all established, they'll have to be

10   operating under their operating parameters.  Any deviation

11   from those, we'll see that in semiannual reporting.

12          And all these additions that are in the consent decree

13   of this new equipment, operating under these established

14   operating parameters, that will all be incorporated into a

15   Title I permit, a new Title I permit, a permit-to-install

16   issued by Ohio EPA.

17          And then that permit will be required to be

18   incorporated into their Title V permit so that moving

19   forward they are required to maintain the system and operate

20   it properly.

21   Q.    And what mechanisms are available if Republic Steel

22   fails to comply with any of the consent decree requirements?

23   A.    Stipulated penalties.

24   Q.    And is there a particular event that triggers most of

25   Republic Steel's obligations and deadlines under the

1    proposed consent decree?

2    A.    Entry of the CD.

3    Q.    Thank you.

4              MS. RICCI:  I have no further questions for Mr.

5    Prentice, Your Honor.

6              THE COURT:  Thank you.

7         Counsel for Republic, do you have any questions?

8              MR. LEWIS:  I do not, Your Honor.  Thank you.

9              THE COURT:  Sir, I have a few.

10        Can you tell me, you inspected the mill on September

11   of 2021?

12             THE WITNESS:  Yes.

13             THE COURT:  And you indicated that -- well, let

14   me ask another question.  And I'm sorry if I bounce around a

15   bit.

16        So do you inspect or have you inspected other steel

17   mills?

18             THE WITNESS:  Yes, I have.

19             THE COURT:  How many?

20             THE WITNESS:  Five to ten.

21             THE COURT:  Just approximately.

22             THE WITNESS:  Yes.

23             THE COURT:  Five or ten?

24             THE WITNESS:  Yes.

25             THE COURT:  Leaded steel, this leaded steel, is

1      this unique to Republic or is it produced by other steel

2      mills?

3                    THE WITNESS:  I believe it is unique to Republic.

4                    THE COURT:  To your knowledge, they're the only

5      mill that produces this leaded steel alloy?

6                    THE WITNESS:  To my knowledge, yes.

7                    THE COURT:  And what is the emission limit, or

8      was, the emission limit pursuant to Republic's SIP?

9                    THE WITNESS:  I believe it was .09 pounds per

10     hour.

11                   THE COURT:  And what was it when you did your

12     inspection?

13                   THE WITNESS:  It would be the same .09 pounds per

14     hour.

15                   THE COURT:  No, I'm sorry.  What was -- one of

16     the violations is excess lead emissions.  What was

17     the -- let me back up.

18          Did you do any testing to determine what the level of

19     emissions were at Republic Steel when you did your

20     inspection?

21                   THE WITNESS:  We did not do any testing, no.

22                   THE COURT:  So how do you arrive at the

23     conclusion that Republic Steel has exceeded its emission

24     limit?

25                   THE WITNESS:  We looked at, during degassing

1    events, how much lead is removed from the steel, from the

2    ladle, and the time period in which that is performed.

3         And we applied the stated control efficiency of the

4    existing BTD system and found that they were exceeding the

5    .09.

6              THE COURT:  So by how much were they exceeding

7    the .09?

8              THE WITNESS:  It escapes me in this moment what

9    our calculations showed.

10              THE COURT:  So you can't tell us how much -- how

11   much lead was being emitted in excess of the emission limit?

12              THE WITNESS:  In this moment, it escapes me, but

13   we did do that calculation.

14              THE COURT:  Do you have it in your papers

15   somewhere?

16              THE WITNESS:  I do not.

17              MS. RICCI:  Your Honor, we can provide that to

18   you.

19              THE COURT:  I would hope so, counsel.  I think

20   that would be extremely important.

21         So we don't know how, at least at this point, the

22   extent of the violation in terms of how much the lead, how

23   much lead, just in layman's terms, lead was being emitted

24   into the air.

25              Do you know how long these emissions were occurring?

1       THE WITNESS:  We believe these excess lead

2    emissions would have occurred whenever they did a lead

3    degassing event.

4       THE COURT:  Do you know how often they were doing

5    these lead degassing events?

6       THE WITNESS:  We requested information from

7    Republic on how often these lead degassing events occurred.

8    And we were told that there was a limit to how far back they

9    kept the records.

10       So we were unable to determine how frequent these are.

11       THE COURT:  So how far back did the records go?

12       THE WITNESS:  I believe through 2020.

13       THE COURT:  2020.  So you only had records for

14    one year preceding your visit, according to the complaint at

15    least, October 20, 2020?

16       THE WITNESS:  That is correct, yes.

17       THE COURT:  We know nothing about what's been

18    transpiring or what emissions, the extent of any emissions

19    from 2004 forward, or thereabouts?

20       THE WITNESS:  Correct.

21       THE COURT:  Wouldn't that be important to know?

22       THE WITNESS:  We did request records to be able

23    to make that determination of how frequently these events

24    did occur but were unable to obtain them.

25       THE COURT:  Does Republic have an

1    obligation -- maybe this is a question for

2    counsel -- Republic have an obligation to keep those

3    records?

4                    THE WITNESS:  They are not.

5                    THE COURT:  They're not.  So they're free to

6    either not disclose, not maintain, or dispose of records

7    that would give us some information about the numbers of

8    emissions?

9                    THE WITNESS:  Based on my understanding of the

10   permit, they were not required to maintain records of these

11   events, no.

12                   THE COURT:  What about their complaint?  Maybe

13   counsel can educate me then why we have a complaint, we have

14   a claim for failure to perform parametric monitoring and

15   recordkeeping.  That wasn't done?

16                   THE WITNESS:  That is -- should I answer that?

17                   MS. RICCI:  Go ahead.

18                   THE WITNESS:  That is a separate requirement in

19   the permit that is not directly related to these degassing

20   events.

21                   THE COURT:  So why is it a separate claim if it's

22   not related to the degassing event?  Just educate me a bit

23   perhaps if you can.

24                   THE WITNESS:  Sure.  So there is monitoring

25   required in the permit for this unit.  And the monitoring is

1    to ensure that the vacuum system is engaged when they

2    introduce lead to this -- to the VTD.  And that was not

3    performed.  And that was included in the NOV.

4                THE COURT:  And how often was that to be required

5    to be performed?

6                THE WITNESS:  That was daily monitoring.

7                THE COURT:  Daily monitoring.  Commencing when?

8                THE WITNESS:  Excuse me?

9                THE COURT:  When was that monitoring supposed to

10   commence?

11               THE WITNESS:  From 2004.  It's a requirement of

12   their permit.

13               THE COURT:  From 2004 forward, daily monitoring

14   was to take place?

15               THE WITNESS:  Yes.

16               THE COURT:  And as far as you can tell it wasn't

17   performed?

18               THE WITNESS:  There was a period of time, one

19   quarter's worth of data, was not recorded.  And that was in

20   2020, I believe.  Or 2021.

21               THE COURT:  Okay.  So, again, educate me.  So

22   from 2004 until when?  I mean, what information do you have

23   in terms of the daily monitoring from 2004 up until 2021

24   when you did the inspection?

25               THE WITNESS:  I believe we asked for data going

1    back -- we usually ask for five years.

2         The data we had when we prepared the notice of

3    violation, that was information that we were provided

4    separately from Ohio EPA.  And in that dataset, we noted

5    that Republic had failed to perform their required

6    monitoring during this one quarter.

7              THE COURT:  What about emissions tests?

8              THE WITNESS:  Emissions -- as far as we were

9    informed, emissions testing was never performed at this

10   unit.

11             THE COURT:  Never?

12             THE WITNESS:  Never.

13             THE COURT:  Going back as far back as 2005?

14             THE WITNESS:  Correct.

15             THE COURT:  Or 2004, excuse me.

16             THE WITNESS:  Yes.

17             THE COURT:  So over the past, since 2004 to 2021

18   there was no emission testing done?

19             THE WITNESS:  Correct.

20             THE COURT:  Is it being done now?

21             THE WITNESS:  It will be done pursuant to the

22   consent decree once --

23             THE COURT:  That wasn't my question.  Sorry.  Is

24   it being done now?

25             THE WITNESS:  No.

1    THE COURT:  So there is no emissions testing

2    being conducted now?

3    THE WITNESS:  Correct.

4    THE COURT:  So we don't know whether lead is

5    being emitted from the plant, from the -- from this process

6    at this point in time?

7    THE WITNESS:  We expect there to be lead emitted,

8    but we don't have any testing to show at what rates.

9    THE COURT:  So we don't know at what rate,

10   whether it exceeds the .09 limit at this point?

11   THE WITNESS:  Correct.

12   THE COURT:  So it's ongoing.  Is this a possible

13   ongoing violation?

14   THE WITNESS:  I would -- I believe that whenever

15   there is a degassing event, that yes, it could continue to

16   exceed their lead emission limit.

17   THE COURT:  Based on your testing or your

18   inspection of the plant?

19   THE WITNESS:  And the calculations we did

20   following the inspection, yes.

21   THE COURT:  All right.  Do my questions give rise

22   to additional questions, counsel for the government?

23   MS. RICCI:  No, Your Honor.

24   THE COURT:  Counsel for Republic, do you have any

25   follow-up questions before the witness steps down?

1          MR. LEWIS:  I do not, Your Honor.

2          THE COURT:  Thank you.

3       You can step down, sir.

4        (Witness excused.)

5          THE COURT:  Counsel for the United States, is

6     there anything else you want to present to the Court at this

7     time?

8          MS. RICCI:  Your Honor, as we mentioned earlier,

9     and as Mr. Prentice just explained to you, we moved quickly

10    to address this significant source.

11       And we believe, again, that the civil penalty recovers

12    the appropriate amount for this violation here.  And I know

13    that, you know, you have mentioned that civil penalty should

14    be, you know, allocated, and as some of the commenters

15    suggested; however, case law has established that once a

16    civil penalty has been determined, you know, we can't open

17    and renegotiate it.  We can't divert money to different

18    programs once the civil penalty has been established and

19    negotiated between the parties.

20       So, you know, the consent decree has to be approved or

21    rejected basically under that standard.

22       I also would just like to mention that the Clean Air

23    Act is not a restitution statute.  Its purpose is to, you

24    know, provide clean air and to protect human health and the

25    environment.

1      And Your Honor, I believe this settlement and our

2    enforcement efforts here, the pace at which we moved, the

3    compliance that we are achieving -- and the compliance that

4    we are achieving goes beyond what Republic Steel would be

5    required to do today without this settlement.  It would be

6    beyond what they are required to do under their permits.  It

7    ensures that they're taking the fullest measures possible,

8    that EPA is going to review and approve to make sure they're

9    properly working to control those excess emissions, and a

10   number of those requirements would not be required without

11   this settlement.

12            THE COURT:  What about the fact that at least at

13   this point there may be ongoing emissions?  We don't know.

14            MS. RICCI:  Your Honor, that's why the consent

15   decree needs to be entered so Republic Steel has this

16   obligation triggered by the consent decree to start this

17   process.  And then the Court then -- the United States has

18   enforcement ability to go in and ensure that this is

19   happening, and the Court also would.

20            THE COURT:  My apologies.  But doesn't

21   that -- does not Republic Steel have the obligation under

22   its permit, irrespective of this consent decree, to monitor

23   its process, make sure they're not exceeding lead emissions

24   in excess of .09?

25            Don't they have an ongoing obligation to do that even

1    before the consent decree?

2          So if they're doing that now, if they are -- I'm not

3    assuming they are.  Guessing.  We don't even know.  But

4    listening to the witness, it would appear -- I want to be

5    cautious.  It would appear when they run this process they

6    very well may be still emitting lead in excess of .09 as

7    their permit requires.

8          So the consent decree, irrespective of that, they have

9    an obligation now, under their permit, now to make sure

10   they're not exceeding the limits, right?

11               MS. RICCI:  Yes.

12               THE COURT:  And they have an obligation to keep

13   records and to let the EPA know when and if they do exceed

14   .09, do they not?

15               MS. RICCI:  As far as the records, I don't know

16   if the requirements are as stringent as what we're going to

17   require.

18               THE COURT:  Irrespective of how stringent, don't

19   they still have a requirement to keep those records and

20   provide them to you?

21               MS. RICCI:  They have a recordkeeping

22   requirement, yes.

23               THE COURT:  But even before the consent decree,

24   though.

25               MS. RICCI:  Yes.

1          THE COURT:  And that's why we're here is because

2     they didn't keep records for years.  Right?

3          MS. RICCI:  That's one of the reasons, yes.

4          THE COURT:  Okay.  So my point is that yes, this

5     is an important step here to make sure that they are in full

6     compliance.  But that should not require, they should not be

7     waiting for me to approve the decree to be in full

8     compliance with the law.

9          Maybe Republic can address that for me.

10         Because if they choose to continue to emit lead, of

11    course the community ought to know that.  After listening to

12    the witness, is someone letting Canton know or the

13    neighborhood around, that, well, these ongoing emissions,

14    there may be ongoing emissions still going on into the air

15    and in the surrounding area around Republic?

16         I would think that's important that they be made aware

17    of that.

18         MS. RICCI:  It's my understanding, Your Honor,

19    that the community has been aware of this given the Ohio

20    action, the United States' action, there have been community

21    outreach meetings, and we've had a community outreach when

22    we had our settlement.

23         So -- and it's evident by receiving public comments

24    about the settlement.  I know that there has been -- so as

25    far as I'm aware, I know that there have been efforts to

1    make sure that the community is aware of everything.  I do

2    not know the full extent.

3              THE COURT:  Is that part of the record in front

4    of me somewhere?

5              MS. RICCI:  In the public comments, and we

6    address that, and there is mentioning of the state case in

7    the record.

8              THE COURT:  Do you have a citation to the state

9    case in terms of -- since it's been mentioned, perhaps that

10   might have some bearing on the issues here.

11             MS. RICCI:  I do not have that on hand, but I can

12   get that for you.  I have it in my materials, so I can get

13   that to you at the end of this hearing.

14             THE COURT:  Thank you.  I appreciate your

15   comments and what you have to -- if you want to submit

16   additional information based on my questions, that would be

17   helpful.

18             MS. RICCI:  Okay.  Thank you, Your Honor.

19             THE COURT:  Do you have another presentation you

20   would like to make?

21             MS. RICCI:  That is all that I have.

22             THE COURT:  Can you reduce the PowerPoint -- I

23   use the old-fashioned term -- the PowerPoint that you

24   presented to the Court?  Can you print that off and file it?

25             THE LAW CLERK:  I have it.

1          THE COURT:  I think my law clerk did.  My clerk

2     took the step of printing it off for us.

3          MS. RICCI:  Thank you, Your Honor.

4          THE COURT:  Counsel for Republic, what

5     presentation would you like to make?

6          MR. LEWIS:  Yes, Your Honor.  If I may just make

7     presentation to the Court on my own.

8          THE COURT:  Sure.  You're free to use the podium,

9     or from the table if you have a lot of papers and would like

10    to remain at the table, as long as you use the microphone so

11    the court reporter can hear you, that's fine, too.

12          MR. LEWIS:  Great.  Thank you.

13       Your Honor, just as an initial matter on behalf of

14    Republic, we appreciate the Court's questions.  And we want

15    to answer those concerns.  And so that's what we're aiming

16    to do.

17       And it's not lost on me that, sitting here for the

18    last couple of hours, the Court needs to have some questions

19    answered.  And I intend to get to work on helping the Court

20    get those questions answered.

21       So I'm committed to doing that.

22       But I thought what I would try to do today is to give

23    a little bit of context because I think I do know some,

24    maybe, more detail than the DOJ does about some of the

25    facts.  And so I did want to give Your Honor some context

1    that may be helpful.

2         So just to kind of provide some context, the facility

3    we're talking about, I'll call it the Flexcast

4    facility -- and there is two.  There is a Flex and there is

5    a CBCF.

6         So in 2004, the Flex received a permit to emit lead

7    and manufacture leaded steel.

8         At the time, the national ambient air quality

9    standards that Congress had implemented were 1.5 micrograms

10   per cubic meter of air.

11        So I don't know if Your Honor is familiar with the

12   NAAQS or the NAAQS monitoring that goes on, but that is a

13   way to monitor lead emissions throughout the country.  And

14   there are monitors all over the place.  And that was what it

15   was as of 2004.

16        In 2008, due to some additional scientific data, that

17   was reduced tenfold.  And now the current NAAQS metric is

18   0.15.  And that's a three-month rolling average measuring

19   the ambient air quality through special monitors set

20   throughout.

21        So I just kind of wanted to provide the Court a little

22   bit of context with this NAAQS monitoring.  That's very,

23   very important to what's going on at Republic Steel today.

24        So in 2004, the permit was issued for the Flex.

25        In 2018, Republic received a permit for the CBCF to

1    manufacture leaded steel and to emit lead.  It does not use

2    the CBCF today.  So no leaded steel is being made at CBCF.

3        And there are provisions that if that ever happens, we

4    have to take a bunch of actions even with this consent

5    decree.

6        But in 2018, the State of Ohio, as part of issuing

7    that permit, set a monitor, a NAAQS monitor, if you will,

8    right outside Republic Steel.  So really right across the

9    street from Republic Steel there is a NAAQS monitor, and the

10   results from that NAAQS monitor are public, publicly

11   available.

12       So as of 2018, the lead emissions at Republic Steel

13   were being monitored whether we were making steel at the

14   CBCF or the Flex.

15       Now, the reality is that between 2004 and 2016, the

16   leaded steel production at Flex was very sporadic.  There

17   was not a lot of demand for that type of steel and so it

18   wasn't being run on a consistent basis.

19       There were heats being run, but not every heat of

20   steel that Republic makes is made of lead.  There is lots of

21   different types of metals.

22              THE COURT:  So do you have records of the runs,

23   the steel runs, the runs of leaded steel?

24              MR. LEWIS:  Yes.  Fair question.  I don't know

25   sitting here today, but I know we have records, some records

1    of what we were running back in those day.

2                THE COURT:  Do you have records of sales of

3    leaded steel?

4                MR. LEWIS:  We may have that.

5                THE COURT:  Okay, because that would be

6    important.

7                MR. LEWIS:  I'm going to do some work on that

8    because I think that's a fair question.

9         Beginning in -- so between 2016 and 2020, we ran no

10   leaded steel at the Flex.  So there was zero Flex steel

11   being run between '16 and 2020.

12        In 2020 --

13               THE COURT:  You have records that will support

14   that?

15               MR. LEWIS:  Yes.  I'll -- I'm going to provide

16   those.  But I just wanted to give Your Honor some context

17   just to make sure, because I heard a lot about whether

18   they've been doing this for -- and it's not quite accurate

19   and I want to give Your Honor the facts and the data behind

20   that.

21        Beginning in 2020 the demand for leaded steel started

22   to tick up, and we moved leaded steel operations from CBCF,

23   closed that down, and just ran it from the Flex beginning in

24   2020.

25               THE COURT:  You're talking about two separate

1      plants when you use these terms?

2                    MR. LEWIS:  Facility in the same site.

3                    THE COURT:  So it's all located in the same

4      location?

5                    MR. LEWIS:  Right in the same area, yes.  Right

6      in the same general area.

7            And in the operation -- setting the Flex operations

8      back up in 2020, that's where we ran into some of these

9      degas events, as part of just getting this operations set

10     up.

11           And, no question about it, and I'm going to provide

12     Your Honor with the publicly available data, we went over

13     the -- so just to orient us a little bit, this starts in

14     about January of 2021.

15           And the NAAQS three-month rolling average is 0.15.

16     And there is a monitor right outside of Republic Steel that

17     is reflected by this blue line.

18                   THE COURT:  I'm sorry to interrupt.  The 0.15,

19     the complaint alleges that 0.09 is the standard.

20                   MR. LEWIS:  Yes.  So the complain alleges that we

21     should have been doing stack testing, like so on-site right

22     on the stack testing, and that that testing, the permit

23     allowed a certain emission of 0.9.

24           I will say that that issue between the U.S. and

25     Republic Steel was contested.  What the U.S. felt was that

1     they could use an acute degas event, which is a very small

2     point in time, period of time, to calculate whether or not

3     we violated the 0.9 out of the stack.

4           Our view of the language was that you have to look at

5     a broader time period, it was more of a continuous steel

6     run, and that that ought to be the calculation.

7           And when the EPA came in and did the inspection, and

8     with all due respect, but I do want to let Your Honor know

9     that we did have areas of dispute.  That wasn't something

10    that we all agreed on right out of the box.  We felt that

11    they had only done a calculation for the very small period

12    of time of a degas event.  And we felt that the calculation

13    should have been for a broader period of time.  And quite

14    frankly, the permit is a bit ambiguous about that.

15          But what was important is we both sat down and said,

16    okay, you have this concern.  We want to make it right.

17          But, importantly, this other NAAQS monitoring is out

18    there to test how much Republic Steel is really emitting

19    into the air.

20                THE COURT:  So who does this monitoring?

21                MR. LEWIS:  It's a standardized monitor set up by

22    the State of Ohio under some certain rules.

23          The quality standards are set by Congress based on

24    reams of scientific analysis of what can be safely emitted

25    into the air in certain areas.

1          So the blue shows that we started to violate the NAAQS

2     in April of 2021.  And this is when we shut down operations

3     right in the fall of 2021.

4          So the NAAQS monitoring had high readings.  We were

5     contacted.  We shut down operations.  And we immediately

6     started taking steps both with the state and with the U.S.

7     EPA to make corrections to make sure that we don't violate

8     those standards because we care about the safety to the

9     community as well.

10          And beginning in October of 2021, with some of the

11     steps that we have taken, including capital investments in

12     securing our facilities, we actually have, for the last 18

13     months, been below the NAAQS standard three-month rolling

14     average through today.

15          And in June of 2022, we actually agreed with the State

16     of Ohio.  They asked us to set up a second monitor over by

17     the nearby community so we could also monitor the air there.

18     The thought was that maybe a wind change or something, you

19     know, might blow something and miss the monitor, although

20     it's right across the street from us.

21          So we agreed to a second monitor to be placed in June

22     of 2022 right by the community.  And as you can see, Your

23     Honor, the public data shows that we've been under that

24     NAAQS.

25                    THE COURT:  There are two monitors?

1      MR. LEWIS:  Yes.  So there is now a monitor right

2   across the street from Republic's operations.  And then the

3   nearby community where we had received some complaints,

4   there is a monitor over by them as well.

5      THE COURT:  But I'm not a scientist, but I do

6   have a little experience with -- we used to call them smoke

7   stacks.  So why would you not put monitors around the area

8   rather than in the immediate proximity of the plant?  If

9   there is emissions, if it's similar to the old types of

10  emissions that would come from coal-fired boilers and

11  plants, then the emissions would spread in a wide area.  And

12  they may be higher emissions further away from the plant

13  than in the immediate vicinity.

14      So why not place emissions or testing devices in the

15  surrounding area, given -- again, I'm going to go

16  back -- given, as you've seen, Comment 3, the numerous

17  schools that are in that region?

18      Why not place, you know, 10, 15 monitoring stations

19  around the area so we can ascertain for certain where this

20  lead is traveling and who may have been exposed, where it's

21  going?

22      Because I -- you know, I don't want to apply personal

23  experience.  The closer you are in to stacks of this nature,

24  you may not get an accurate reading, meaning how far the

25  emissions may have dissipated around the area.

1           MR. LEWIS:  The decision to place those monitors

2     is not our decision.  It's not a Republic Steel decision.

3     It's a state sort of regulatory decision.

4           But I will say that there is a fairly sophisticated

5     analysis.  And one that's way over my head on calculations

6     that they do on where to place those monitors to be in the

7     most effective places to measure the emissions in the area.

8           THE COURT:  Well, is the U.S. EPA involved in

9     that process at all?

10          MR. LEWIS:  I'm actually not sure about that.

11          THE COURT:  Did they come to you and say, as part

12    of this consent decree going forward we're going to place

13    monitoring devices around the community because we want to

14    be sure and make certain that we don't have any concerns

15    about lead emissions into the surrounding area?

16          MR. LEWIS:  That wasn't part of the consent

17    decree discussions that I was familiar with.

18          THE COURT:  So we don't have any provisions in

19    the consent decree for monitoring outside the

20    immediate -- when I say the immediate area, the surrounding

21    area where the schools and all the other concerns are, the

22    neighborhoods, etcetera, around the area?

23          MR. LEWIS:  Well, I think the community monitor

24    does address those concerns.  There was fairly detailed

25    analysis done before that monitor was placed where it was.

1    And the community concerns were what prompted the state to

2    place the second monitor.

3              THE COURT:  Do you know where it's at, how far

4    from the plant it might be?

5              MR. LEWIS:  I should know this.  Maybe a mile.

6         But I can get that detail for you, Your Honor, give

7    you a map.

8              THE COURT:  That would be helpful.  There is

9    three elementary schools within one mile of the Republic

10   Steel plant.

11             MR. LEWIS:  Understood.  And I think, honestly, I

12   think the Court might also benefit from how the state

13   determined the location of that monitor.

14             THE COURT:  Yeah, and according to Comment 3,

15   there is 24 schools or licensed daycare centers also within

16   that same general radius of the plant.

17             MR. LEWIS:  But what we do know is that the

18   monitoring that has been set up that was calculated to

19   gather the emissions that are actually coming from Republic

20   have been under 0.15 since October of 2021.  That we -- I

21   mean, that's what we do know.

22             THE COURT:  I guess someone will have to educate

23   me because if the permit says .09 and you're using the .15,

24   then that's an issue.

25             MR. LEWIS:  Right.  So let me try to explain the

1     difference between the 0.9.  The 0.9 is an on-site

2     on-equipment test, sort of out-of-the-stack test, if you

3     will.

4          And again, it's more sophisticated than that, but it's

5     testing the actual piece of equipment, the actual facility.

6          These air monitors are testing the air around Republic

7     Steel.  So they're not testing the actual piece of

8     equipment.  They're testing the air generally.

9          I mean, there could be lead sources from other places.

10    There really aren't any other manufacturing facilities

11    anywhere else around, but there could be.

12         The point being that the real important point is the

13    0.9 is really designed to make sure that we stay under this.

14         The permit is designed to not violate the NAAQS air

15    quality standards because we know from scientific data and

16    congressional study that if you stay under this, the

17    community, the surrounding community will be safe.

18         You can't have zero lead emissions -- or I guess we

19    could, but we don't.  But if we stay under this in the area,

20    it's going to be okay.  And that's the important point.

21         And the 0.9 is really designed to kind of get to that

22    standard.

23              THE COURT:  And what predates June of '21?

24              MR. LEWIS:  January '21, yes.

25         So that's roughly -- this is to kind of reflect the

1    Flexcast, I guess, emissions.

2              THE COURT:  What predates it though?  Are there

3    emissions prior to this date?

4              MR. LEWIS:  There were emissions.  It started to

5    be monitored in 2018.  And when the CBCF was operating, I

6    believe there were two instances of exceeding the NAAQS

7    standards by the CBCF which isn't part of this violation.

8         And eventually CBCF was shut down.

9              THE COURT:  Well, counsel says there was 22 and

10   possibly 33 emissions that exceeded the permit.

11             MR. LEWIS:  Yes.  And I think if I'm

12   correct -- and I can let the government correct me if I'm

13   wrong -- they're calculating that as a degas event.

14        So the government's view is that every time we have a

15   degas event, we exceed the 0.9.  We honestly disagree with

16   that because we don't think that's the right measurement.

17   But we have actually eliminated degas events in our facility

18   already.  We're already there.  We've eliminated degas

19   events and minimized them.  And that is for sure why we've

20   been staying under this 0.15.  We've fixed our operations.

21        And we already made one of the required upgrades in

22   the consent decree which was kind of due by September of

23   2022.  We've made that.  And that's reflected here.  In

24   August of 2022 we installed demisters in the cooling tower.

25   That was one of the provisions.  And, you know, there was at

1    least some data to suggest there was an impact even with

2    just that one step.

3         The other thing, Your Honor, that I just want to make

4    sure of -- and I have the amended consent order for

5    preliminary injunction that's been entered in the state

6    court proceeding, so we're actually operating under a

7    preliminary injunction from the state, and that requires

8    certain actions to be taken if we get even close to this

9    0.15.

10        And if we start to approach it -- for instance, in

11   August of 2022, we started to approach the 0.15, and under

12   the preliminary injunction order we were required to curtail

13   production until we were able to investigate and reduce.

14             THE COURT:  So what did -- I'll have to read it.

15   How did the .15 standard, is that in this decree that you

16   have, the State of Ohio?

17             MR. LEWIS:  Yes.

18             THE COURT:  How did they get there in the face of

19   the permit which purportedly is .09?  And I'm referring to

20   the complaint.

21             MR. LEWIS:  Yes.

22             THE COURT:  So how did the State of Ohio get to

23   .15 when according to the complaint the permit is .09?

24             MR. LEWIS:  So the state is looking at the air

25   quality and how that is being measured and requiring us to

1     take steps whenever the air quality at either of the

2     monitors, either the one by the community or the one across

3     the street, start to reach certain levels.  So they're

4     looking at the actual air quality.

5          The 0.9 is just the calculation of the test inside the

6     facility that the EPA is taking issue with.

7                    THE COURT:  Go ahead.

8                    MR. LEWIS:  Okay.  Sorry.  I wanted to make sure

9     Your Honor was able to -- so what I wanted to make clear,

10    and again, I think we need to build a better record for Your

11    Honor on this, and that's what I'm going to do after today

12    if given the opportunity to do that, this isn't a situation

13    where there have been hugely high levels of lead being

14    emitted from Republic Steel for decades and decades.  That

15    isn't the scenario here.

16         The leaded steel production was sporadic for many

17    years, nonexistent for some years, and picked up in 2020.

18    And there have been air quality monitors in the area that

19    when those were triggered, immediate action was taken.

20                    THE COURT:  Well, here is my problem.  How do we

21    know how often we've had these emissions?  Because we don't

22    have, according to the government, we don't have records for

23    many, many years.

24         So how are we to know how many emissions there are, or

25    how many -- I'll use the word discharge -- how many

1    discharges there have been and at what levels?  How are we

2    going to know that if there has been no records kept?

3                    MR. LEWIS:  Well, the records that have been kept

4    since 2018 reflect the air emissions which is the actual

5    emission.

6                    THE COURT:  2004 to 2018?

7                    MR. LEWIS:  2004 to 2018, we do have some

8    records.  But there was a quarter where we could not find

9    some parametric monitoring records.  That's the monitoring

10   that's supposed to be done to make sure that we're staying

11   under the emissions.  And we self-reported that.

12       And obviously that's become part of the consent

13   decree, that those recordkeeping functions need to be

14   tighter.

15                   THE COURT:  Perhaps I missed it.  I think -- did

16   not the witness say there was no emissions tests done from

17   2004 forward until 2020, 2021?

18                   MR. LEWIS:  The test that wasn't done

19   was -- there is various testing and procedures that need to

20   be followed.  There is parametric monitoring, stack house

21   procedures.  The one test that hadn't been done was what's

22   called a stack test.

23       And again, there was a debate about the methodology to

24   conduct a stack test to make sure you get accurate

25   information.  And we debated that with the United States.

1  And that's how we arrived at this consent decree.

2                THE COURT:  Was the testing done or not?

3                MR. LEWIS:  There was no stack test done.

4                THE COURT:  So cut to the chase, you weren't

5  doing the testing that was required for all that period of

6  time.

7                MR. LEWIS:  There was no stack test done.

8                THE COURT:  So that would deprive us from having

9  information about the emissions or level of emissions,

10  right?

11               MR. LEWIS:  I don't think so.

12               THE COURT:  You don't think so?

13               MR. LEWIS:  I think you can look at other data,

14  the monitoring data, obviously the air emission monitoring

15  data.

16       There is other sources of information.

17       And the stack test is an extremely difficult test to

18  get accurate readings, and that was the point that we had

19  made to the government the whole time.

20       So that's how we arrived at this consent decree.

21               THE COURT:  So go ahead.  Anything else you want

22  to add?

23       I'm looking or waiting to hear you discuss some of the

24  issues that were raised by the commentators in terms of the

25  comments that were submitted about the community and harm to

1          the community and issues, the community-related issues as it

2          relates to these discharges over these many years.

3                    MR. LEWIS:  Sure.  So I think we need to make a

4          better record of the data such as maybe more of this

5          monitoring data to show that if we're under a government

6          studied standard of air quality, that that is by nature not

7          an unsafe emission, number one.

8                    Number two, we do know that the county has performed

9          blood level testing of individuals.  And I'll try to get my

10         hands on that data and submit it to the Court or at least

11         reports of that data.  But there were no reported elevated

12         blood levels, blood lead levels.

13                   THE COURT:  Do we know how many tests were done?

14                   MR. LEWIS:  That's what I need to get.  So I'm

15         going to need to submit that information to the Court.

16                   THE COURT:  So directly, why is it that we have

17         to rely upon the county to do this type of testing?  Why is

18         that not part and parcel of this decree, that we do things

19         to make sure the community is safe, that there has been no

20         undue harm, that there has been no lead emissions that would

21         cause any damage to the health, safety, and welfare of the

22         community?

23                   Why is this not something that's part and parcel of

24         the decree, that the government doesn't insist on, that

25         Republic doesn't step up and say we're going to provide the

1    appropriate funds to see that these issues are taken care

2    of?

3          MR. LEWIS:  Well, in my view the consent decree

4    does address public safety.

5          THE COURT:  How?

6          MR. LEWIS:  And public health.

7          THE COURT:  How?

8          MR. LEWIS:  Because it looks at the available

9    information that we do have and makes sure that on a going

10   forward basis it's going to improve.  We're already showing

11   huge significant improvements in the air around the

12   facility.

13         THE COURT:  I'm sorry to interrupt, sir.  Going

14   forward, I understand what you're proposing going forward as

15   to a good faith attempt to remedy the problem, going

16   forward.

17         But as the commentators have stated in their letters,

18   which are compelling, what about the harm in the past?  What

19   studies have been done?  What testing has been done?  What

20   efforts have been made to see whether or not these releases

21   over many years -- you want to point, as certainly it's

22   appropriate, you want to be point me to a specific window of

23   time.  But arguably, these releases have occurred for a

24   period of time over many years, the extent of which we do

25   not know.

1          And so why not make sure that we take care of these

2     issues as raised, any contamination caused by previous

3     emissions, any health issues that may have been caused by

4     these previous emissions.

5          We just don't know and no steps have been taken to try

6     to address it.

7          In cases of this nature, by way of example, if there

8     is a -- I don't want to use the word compare.  There is any

9     number of cases where there is contamination.  There has

10    been inappropriate releases, either air, water, discharges

11    that cause harm to the community, harm to landowners, harm

12    to farmers, harm to others.

13         And is it not appropriate for those who may have

14    violated their permit or violated the law, Clean Water Act,

15    Clean Air Act, to step up to the plate and do the things

16    that need to be done to ensure the safety of the community?

17         And the points made, with all due respect -- and I've

18    had two of these cases now -- where the community at large

19    around the area where the EPA is involved, is a poor area.

20    It's a poor, very poor area.  And you've got -- here you've

21    got a community of color and a lot of poverty.

22         And we're really doing nothing, as the letter states,

23    to make sure that their interests are protected.  That's

24    part of what this is all about, right?

25              MR. LEWIS:  Sure, I agree.

1        THE COURT:  Protecting the health of the

2    community.

3        MR. LEWIS:  I agree.

4        THE COURT:  Children, asthmatics, the elderly,

5    seeing to it there is no problem.

6        We just don't know because no steps have been taken,

7    and I read this -- and I'll shut up -- but I read this and

8    as I listen to you, and it's basically, well, we'll let the

9    county, Stark County, handle that.  We'll let them handle

10   that.

11       Or, as I read the papers, well, maybe in the future,

12   the EPA, maybe we'll do something in the future to address

13   the problem.

14       Well, in my view, that's not really the way it should

15   be done.  With all due respect, it's not the way it should

16   be done.  It's not that we're just going to ignore the

17   community at large -- we're not going to ignore what

18   happened in the past.

19       As the letter states, "The community deserves to be

20   protected from the contamination caused by previous

21   emissions, in addition to the settlement."

22       You're going to minimize future emissions, hopefully,

23   but that doesn't resolve the problem or the issue of what's

24   happened in the past and what if any damage has been done to

25   the health, safety, and welfare of the children and those

1    around the area.

2         And I don't know -- you're going to tell me, I assume.

3    Somebody is going to give me information about a couple of

4    things.

5         Number one, what was the extent of the testing that

6    was done down in Stark County?  What type of notice was

7    given?  Did somebody send out a notice to the schools in

8    that area and say, by the way, you should all be aware that

9    there has been a release of lead into the air by Republic

10   Steel, and it occurred on these dates and times and over

11   these number of years, and you should be aware of it?  And

12   you should notify parents.  We should set up testing.  We

13   should see that all your children should be tested to make

14   certain that your children haven't suffered from any adverse

15   affects and harm from these lead -- these lead releases.

16        Same with landowners.  This all should be tested, make

17   sure there is no lead in the soil, or undue amounts of lead

18   in their soil.

19        It's all -- again, should be part and parcel of all of

20   this in my view.

21        To simply say, well, we're going to address it going

22   forward, well, you're required to do that as a matter of law

23   now and make sure there is not excess lead going into the

24   air.  That should be ongoing.  It should be in place now.

25   And reporting should be done now, irrespective of the

1    decree.  But as far as what happens -- has happened in the

2    past, I don't see the parties providing any assurance to the

3    Court that you're going to address that, as the commentators

4    have asked for, and rightfully so, and in great detail, I

5    might add.

6         And they make a compelling case in their letters.  And

7    the response to it has been inadequate.  It's been, well, we

8    may in the future address it.  Or, we really don't need to

9    address it.

10         And I don't see that as being the appropriate response

11    to, again, what I've already stated.

12         So, go ahead, counsel, if you want to add anything,

13    you may.

14         MR. LEWIS:  I hear you, Your Honor.  I would ask

15    that we have the opportunity to submit additional

16    information to the Court to address the Court's concerns.

17    And I, you know, I want a shot to do that.

18         THE COURT:  I would like to know exactly how much

19    money -- the general revenue of Republic Steel, number one,

20    over the last five years.

21         I would like to know also, as well, the revenue that's

22    been produced -- generated from the production of this

23    leaded steel alloy.  The government's witness says you're

24    the only plant that produces it, at least to his knowledge.

25    And so I would like to know how much -- what the profits

1    have been from leaded steel over the course of the last five

2    years.  We'll use that as well.

3        And then you can also -- I'll do some research to see

4    what the extent of my authority is.  You can explain to me

5    what it is that binds my hands in terms of the $990,000

6    penalty, how that is sufficient -- we'll use the term that

7    we use in criminal law -- sufficient but not greater than

8    necessary to meet the purposes of the law.  That is, I would

9    think deterrence would be an important one to make sure that

10   anyone else who wishes -- or may find themselves in

11   violation of their permit would be deterred from that

12   ongoing -- or that problem.

13       So you can educate me about that issue as well.

14       Anything else, counsel?

15           MR. LEWIS:  Not here, Your Honor.

16           THE COURT:  Thank you.

17       Anything else anyone wishes to add?

18           MS. RICCI:  No, Your Honor.

19           THE COURT:  Timeframe you would like for any

20   supplemental submissions, you may do that.

21       Do you wish to file anything supplemental?

22           MR. LEWIS:  I certainly would like to, Your

23   Honor.

24       I don't want to delay, but 45 days?

25           THE COURT:  That's fine, counsel.  You

1    can -- certainly, you may do that.

2        Again, I would hope the EPA is enforcing the statutes

3    as they are, the Clean Air Act statutes.  I know there is

4    some argument that, Judge, you've got to do this right away.

5    Otherwise there is going to continue to be emissions.  I

6    hope that's not a problem.

7        MS. RICCI:  Well, Your Honor, as we stated today,

8    until entry of the consent decree, we cannot enforce this

9    and Republic Steel is not going to start installing the

10    compliance requirements.

11       So I mean, I would request maybe that we have a

12    shorter time period to supplement the record.

13        THE COURT:  So your expert can't go out and

14    inspect the premises?

15        MS. RICCI:  He can.

16        THE COURT:  He can go out and test the emissions,

17    the level of emissions, can he do that?

18        MS. RICCI:  He can -- testing the level of

19    emissions, they would have to be running certain operations.

20    I don't know the answer to that specific question.

21       But I'm just saying, the entry of the consent decree

22    is going to be what triggers their obligations to start

23    doing certain compliance requirements, having us have that,

24    you know, ability to enforce those mechanism and come to you

25    if it's not happening.

1      I just -- that's my only point I wanted to make, and

2   that, you know, therefore if you want us to submit

3   additional information to supplement the record, I would

4   like that to be a shorter time period just so we can have,

5   you know, finality on this, you know, proposed --

6      THE COURT:  Counsel, I'll be blunt with you.  If

7   I were to pass judgment on this today, I would deny the

8   request.  I don't think it meets the requisite standard in a

9   number of ways.  And I can write on it and spell it out for

10   you if you would like.

11      But I have grave concerns about any numbers of things

12   that have been -- in the papers and what I've heard here

13   today.  I've have gave concerns about this and whether it

14   meets the requisite standard.  Gave concerns.

15      And I can write on it.  And I need to do some research

16   about the full extent of, you know, what I need to consider

17   in deciding the approval of this.

18      I know it's rare that these matters are not approved

19   out of hand, but I take a different view.  I think I have an

20   obligation to review these matters carefully, considering

21   the nature of the harm and the nature of the comments from

22   people, individuals that I think have the interests of the

23   community at heart.

24      And I think that's important.

25      This is not a -- I'm not going to rubber stamp it.  I

1    think some judges would, to be blunt.  So it's not going to

2    be a rubber stamp.

3         I'm going to analyze it all carefully and I'm going to

4    look carefully at everything I've addressed here today.

5              MS. RICCI:  Yes, Your Honor.

6              THE COURT:  And just so in the interest of full

7    disclosure, the responses to the commentators has been

8    woefully inadequate.  Woefully inadequate.

9         You haven't really addressed it straight out as one

10   would hope you would do.

11        And so you can address them if you would like.  If you

12   do not, then I'll grant you 45 days.  And then we will put

13   up an order once we have it.  The criminal docket, we're

14   backlogged with criminal trials because of the pandemic.

15   We'll deal with it.

16        I do note, I do see in the back of the courtroom a

17   representative who submitted one of the comments.  So

18   counsel who did submit one of the comments on behalf of the

19   community, Legal Aid, he's here.  If he wants to make a

20   supplemental submission based upon what he has heard, I will

21   certainly accept it.  If he chooses not to do so, that's

22   certainly his right as well.

23        So we'll have this all typed up and transcribed, and

24   then we'll take the matter under advisement after we have

25   all the submissions, anything else you want to submit,

1   counsel for the government.  You're free to do that as well,

2   counsel for the defendant.

3               MR. LEWIS:  Thank you, Your Honor.

4               THE COURT:  45 days.  Again, make sure I have

5   annual revenue for Republic Steel as well as the

6   documentation regarding the amount of sales of this leaded

7   steel as described so I can consider whether or not that is

8   an economic benefit that I may consider as part of the

9   evaluation of the case.

10      I know that may be something of first impression, but

11  we will consider it.

12      Anything else?

13               MR. LEWIS:  Nothing here, Your Honor.

14               THE COURT:  Thank you very much.  We appreciate

15  it.  We'll look forward to seeing your submissions.

16      Everyone have a good afternoon.  Hopefully the weather

17  will turn.

18      (Proceedings concluded at 12:40 p.m.)

19

20

21

22

23

24

25

1                          I N D E X

2

3      DIRECT EXAMINATION OF DAKOTA PRENTICE              37

4      BY MS. RICCI

5

6

7                     C E R T I F I C A T E

8

9            I certify that the forgoing is a correct

10     transcript from the record of proceedings in the

11     above-entitled matter.

12

13               S/Caroline Mahnke          5/10/2023

14               Caroline Mahnke, RMR, CRR, CRC    Date

15

16

17

18

19

20

21

22

23

24

25